THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY A. LAURANT, Defendant-Appellant.

(No. 53704;

First District—October 30, 1970.

Gerald W. Getty, Public Defender, of Chicago, (George L. Lincoln and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Thomas W. Walsh, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

Defendant, Henry A. Laurant, was indicted for aggravated battery and attempt murder. After a trial by jury, he was found guilty of both offenses and was sentenced to the Illinois State Penitentiary for not less than ten nor more than fifteen years.

On appeal, the defendant contends that the court improperly instructed the jury as to the offense of attempt murder and, further, that the defendant's written confession was improperly admitted into evidence because the defendant did not knowingly and intelligently waive his right to have an attorney present during interrogation by the police.

At approximately 1:30 A.M. on June 15, 1967, Henry Cross and his wife, Sara, were returning home after having seen a movie in downtown Chicago. They resided in a second floor apartment at 1550 West 69th Street, Chicago. The first floor of the building was occupied by a tavern, the Golden Angel Lounge. Mrs. Cross was the owner of the tavern and Mr. Cross was employed as a Police Officer for the City of Chicago. Mr. Cross was not on assigned duty at the time.

After arriving at 1550 West 69th Street, Mr. Cross met some friends in front of the tavern and stopped to converse with them. Mrs. Cross went into the lounge. A short time later, one of the tavern patrons came outside and informed Mr. Cross that Mrs. Cross was having difficulty with a customer. Cross proceeded into the tavern and asked his wife what had happened. She indicated that she had served the defendant, who was sitting at the bar, a bottle of beer and he had smashed his glass against the bar and cursed at her.

Cross then approached the defendant and, after giving the defendant forty cents for the beer he had purchased, asked him to leave. Cross picked up the broken glass and the bottle and put them on the inner edge of the bar. Cross then walked outside and the defendant followed. At no time did Cross raise his voice or put hands upon the defendant.

When the two men were outside, the defendant mumbled something to Cross and then walked away. The defendant crossed the street, paused to lean on a parking meter for a few minutes and then walked east on 69th Street.

A short time later, while Cross was still speaking with two friends in front of the tavern, the defendant approached from the west. Cross did not readily recognize the defendant as he approached because the defendant had changed his outer garment. When the defendant had advanced to within a few feet of Cross, he pulled a small caliber revolver from his pocket, said something like "I'm back" or "I'm ready" and shot Cross in the chest. The defendant then ran diagonally across the street. After being shot, Cross ducked into the tavern, drew his service revolver,

came back outside and fired five shots at the fleeing defendant. None of these shots struck the defendant. Cross was treated at the Billings Hospital for a gunshot wound to the chest. The bullet itself was lodged in Cross' back and was not removed.

About three o'clock the next afternoon, detectives of the Chicago Police Department proceeded to 7002 S. Laflin Street, the defendant's address. There they were admitted into the second floor apartment by Bob Sanders, who shared the apartment with the defendant. The officers found the defendant sleeping in a rear bedroom, awakened him and announced themselves as police officers. The defendant asked if the officers were there about the man he shot the night before in the vicinity of 69th Street and Ashland Avenue. The officers replied that they were and the defendant informed them that the gun he had used was in the closet. One of the officers recovered a .22 caliber pistol from the closet. Another officer put handcuffs on the defendant, informed him that he was under arrest and advised him of his constitutional rights. The defendant was then taken to the Area 3 Homicide Office at 3900 S. California Avenue. There, about four o'clock and after again being advised of his constitutional rights, the defendant gave a written confession.

Prior to trial, the deendant moved to suppress the written confession. As grounds for his motion, the defendant alleged that he had not been advised of his constitutional rights prior to his interrogation by the police and, further, that his confession was the product of coercion by the police.

At the pretrial hearing on the defendant's motion to suppress the confession, Detective Leo Wilkosz testified that he conducted the interrogation of the defendant. Present during the interrogation were Detective Wilkosz; Margaret Sea, a police stenographer; Dolores Champ, an employee of the Golden Angel Lounge; and, the defendant. Officer Wilkosz stated that he gave the defendant the four *Miranda* warnings and the defendant indicated that he understood his rights. The officer further testified that the defendant expressed a desire to give a statement and at no time requested the services of an attorney. The statement consisted of questions and answers which were recorded by the stenographer and subsequently transcribed into four typewritten pages. The statement was then read back to the defendant and, finding no error, he signed each page. Officer Wilkosz also testified that the defendant was at no time subjected to physical abuse, threats or coercive promises.

During the pretiral hearing, Detective Paul Parizanski testified concerning the defendant's arrest. Officer Parizanski stated that he placed the defendant under arrest at the defendant's apartment and gave the *Miranda* warnings. After giving the warnings, Officer Parizanski asked

the defendant: "Do you understand it"? According to Parizanski, the defendant replied: "Yes, I have been through all this before." The officer further testified that the defendant was in·no way abused and was not interrogated concerning the shooting incident until they arrived at the detective office. Officer Parizanski did not participate in the interrogation at the office.

Dolores Champ testified that she was present during the interrogation of the defendant at the detective office. She indicated that the interrogating detective advised the defendant of his constitutional rights and, in response to a question asking her if she remembered what the officer said, replied:

"First of all, he had a card and he gave him the card and he asked if he could read, and he said, well, 'this is your constitutional rights that you don't have to answer any questions, or if you don't have a lawyer, or can't afford a lawyer, the court will get you a lawyer,' and two or three other questions he asked him. He asked him did he know what he was talking about, and he said 'Yes.' "

Mrs. Champ further testified that the defendant told the officer that he had never been to school but could read and write "a little." She indicated that the defendant's statement consisted of questions and answers which were recorded and subsequently transcribed by a stenographer. Concerning what had occurred after the stenographer returned with the four page transcription, Mrs. Champ testified:

"The detective took a copy of it and gave a copy to the defendant and he told him to read along with him, and he read out what he had said, and he asked him 'Did you understand what,' you know, 'what is on the paper?' He said yes, and he read through the papers and then he signed."

The witness also stated that the defendant was not subjected to abuse while she was present and showed no signs of having been abused.

Margaret Sea, a police stenographer, testified that she had twenty-five years of experience as a stenographer and was called in by Detective Wilkosz to record the defendant's statement. She indicated that the detective asked questions and the defendant answered every question. She took down the conversation in shorthand and, when the conversation had ended, immediately transcribed her shorthand notes with a typewriter. She was present when the defendant signed the statement. She also stated that the defendant was not subjected to abuse while she was present and, further, that he showed no signs of having been abused.

Each of the above witnesses identified both the defendant and the statement signed by the defendant.

The defendant testified in support of his motion to suppress that he

had never been to school, could not read and could write only his name. He indicated that prior to his interrogation he was told that he had a right to remain silent and that anything he said could and would be used against him in a court of law. He stated, however, that he could not remember being advised of a right to have an attorney present or of his right to have an attorney appointed if he was indigent. He then denied having made several factual statements contained in the confession. He admitted signing the confession but said he did not know what he was signing at the time. He could not remember whether the statement was read to him before he signed. He concluded his testimony by stating that if he had been advised of his right to have an attorney present during interrogation, he would have asked for an attorney.

At the conclusion of the hearing, the trial judge denied the defendant's motion to suppress the confession "on the ground that the evidence, as submitted to this court, indicates that the defendant was adequately advised of his constitutional rights; that there had been no violation of his constitutional rights; that the guidelines, as set forth in *Miranda v. Arizona*, were wholly and specifically and adequately complied with."

In *Miranda v. Arizona* (1966), 384 U.S. 436, the United States Supreme Court enunciated those rights of which an accused must be advised prior to custodial interrogation. Concerning the waiver of those rights, the court said:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel.

\* \* \*

\* \* \* a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

\* \* \*

Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer." 384 U.S. at 475.

Defendant relies upon this language of *Miranda* in support of his argument that his confession was not voluntarily given because he did not knowingly and intelligently waive his right to have an attorney present during interrogation. He emphasizes that he has never been to school, cannot read or write, does not remember being told of his right to have an attorney present during interrogation, and would have asked

for an attorney if he had known of and understood his right to counsel. He does not suggest on appeal that he was not advised of his constitutional rights prior to interrogation. Thus, this issue concerns only a question of waiver.

■■ At the outset, we note that in cases such as this, where it is undisputed on appeal that the *Miranda* warnings have been adequately given at the inception of the questioning, we must make an *ad hoc* determination of the facts bearing on the issue of waiver since no *per se* rule has yet been adopted to govern this problem. (*Narro v. United States,* 370 F.2d 329, (5th Cir. 1966), *cert.* denied, 392 U.S. 936 (1968); *People v. Hill* (1968), 39 Ill.2d 125, 233 N.E.2d 367.) In this connection, we deem it appropriate to set out relevant portions of the defendant's confession:

"Q. Do you know you have a right to remain silent?

A. Yes of course I know that.

Q. Do you know if you choose not to remain silent anything you say or write can and will be used as evidence against you in court?

A. Yes.

Q. You have a right to consult a lawyer *before any questioning* and you have a right to have the lawyer *present with you during questioning. Do you know that?* [Emphasis added]

A. Yes.

Q. You not only have a right to consult with a lawyer *before any questioning* but, if you can't afford a lawyer, a lawyer will be appointed to represent you before any questioning, and *you may have the appointed lawyer present with you during any questioning. Do you know that?* [Emphasis added]

A. Yes I do.

Q. Do you still wish to give us a statement even though you don't have to?

A. Yes."

We believe that the words used by the interrogator were sufficient to impart to the defendant a clear, understandable warninv of all of his rights. (*Coyote v. United States,* 380 F.2d 305 (10th Cir. 1967), *cert.* denied, 389 U.S. 992 (1967); *People v. Bosveld* (1969), 109 Ill.App.2d 317, 248 N.E.2d 697.) The defendant showed that he was fully aware of his rights by answering "yes" after each warning. He was asked if he wanted to give a statement and he voluntarily did so. The testimony of those who were present during the interrogation and the tenor of the confession itself do not support defendant's allegations that he was confused, uncertain and unaware of his rights. It is undoubtedly true that the defendant had little or no formal education, but his illiteracy alone

is not the sole criterion to be used in determining the voluntariness of his confession. In determining whether a confession is voluntary, a court may consider many factors, including the mode of detention, its duration, the relentlessness of the interrogation, the regard for rudimentary necessities, the advice given the defendant concerning his constitutional rights, evidence as to whether those rights were knowingly and intelligently waived, and the defendant's age, experience and education. (See *People v. Hester* (1968), 39 Ill.2d 489, 237 N.E.2d 466; *People v. Pierre* (1969), 114 Ill.App.2d 283, 252 N.E.2d 706.) We believe that the totality of circumstances in this case clearly establish that the State has met its "heavy burden" of demonstrating that the defendant knowingly and intelligently waived his right to retained or appointed counsel. The defendant's confession was, therefore, a voluntary confession and was properly admitted into evidence at the trial.

Defendant also argues that the court improperly instructed the jury concerning the ozense of attempt murder. The thrust of his argument is twofold. First, he contends that the jury was not instructed on the elements of the crime of attempt murder. Secondly, he contends that the instructions given confused the jury as to the mental state required for the crime of attempt murder.

Concerning the offense of attempt murder, the court instructed the jury as follows:

STATE INSTRUCTION NO. 11.

"The Court instructs the jury that in the language of the statute a person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or he knows that such acts create a strong probability of death or great bodily harm to that individual or another."

STATE INSTRUCTION NO. 12.

"The Court instructs the jury that in the language of the statute a person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense."

Defendant suggests, in effect, that the court's failure to mention the specific offense of murder when it instructed the jury as to the crime of attempt rendered the instructions legally inadequate. We do not agree.

We note, first, that at the commencement of the trial and shortly after the jury was sworn, the judge advised the jurors as follows:

"* * * This is a case arising out of an indictment in which * * * the defendant is charged with the offense of attempt in that he with

intent to commit the offense of murder attempted to kill Henry L. Cross without lawful justification. He is also charged with the offense of aggravated battery * * *."

Thus, at the outset of the trial the jury was aware that the defendant was being tried for two distinct offenses: attempt murder and aggravated battery. Defendant's argument that the "specific offense" mentioned in State's Instruction No. 12, which defined attempt, could be construed by the jury to mean some offense other than murder is, therefore, unimpressive. In addition, as the State points out, the instruction on murder was immediately followed by the instruction on attempt. Based on these circumstances, there can be no doubt that the jury understood that the "specific offense" mentioned in the instruction on attempt was the offense of murder. In State's Instruction No. 11, the elements of the offense of murder were given to the jury. In considering the two instructions together, the jury could have encountered no difficulty in understanding that the mental state necessary to commit the offense of attempt murder embodies an intent to kill.

■■ We, therefore, conclude that the instructions to the jury concerning the offense of attempt murder were proper in this case. The jury was *not* left to its own devices in determining what "specific offense" the court was referring to in its definition of attempt. See *People v. Davis* (1966), 74 Ill.App.2d 450, 221 N.E.2d 63.

For the foregoing reasons, the judgment of conviction is affirmed.

Judgment affirmed.

McCORMICK, P. J., and BURKE, J., concur.