People of the State of Illinois, Plaintiff-Appellee, v. Roy Pierre, Jr., Defendant-Appellant.

Gen. No. 51,847.

First District, Fourth Division.

September 3, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Stephen W. Stoll, James N. Gramenos, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE McNAMARA delivered the opinion of the court.

Defendant, Roy Pierre, Jr., was charged with the offenses of forcible rape and robbery. Prior to trial and after a hearing, a motion to suppress certain oral statements made by defendant was denied. After a bench trial, defendant was found guilty of both charges and sentenced to a term of two to three years in the penitentiary, the sentences to run concurrently. Defendant appeals, contending that defendant's oral statements should have been suppressed, and that he was not proved guilty beyond a reasonable doubt.

At the pretrial hearing on the motion to suppress certain statements, the following testimony was adduced. Officer James Severin of the Chicago Police Department testified for the State that he was assigned to investigate a rape. On January 16, 1966, defendant, his mother and a friend of hers came to the police station. A lineup was held, and the complaining witness identified defendant as her assailant. The witness then took her statement in the presence of the defendant, and this took from forty-five minutes to an hour. After the statement was typed, defendant stated that he committed the crime, and that he was sorry. He also asked the complaining witness not to press charges against him. After the complaining witness left, defendant's mother came into the room. In her presence, defendant at first denied, then admitted committing the acts in question. At no time had defendant requested the presence of his mother or an attorney.

On cross-examination Severin testified that he had called defendant on January 14, and had asked him to come into the station. He again called on January 15, talking to defendant's mother, and requested that defendant come in Sunday, January 16. The witness ar-

rived at 4:45 p. m., and found defendant sitting in an office and his mother directly outside the office. From the time the witness arrived, defendant was not interrogated by anyone until the witness began asking questions at about 6:45 p. m. in the presence of complainant. He did not advise defendant of his right to an attorney or the presence of his parent. He knew that defendant was 17 years old. Defendant gave his statement about 7:05, and was not asked any further questions. From 7:05 to 7:25 the witness typed up the arrest slip, and then called in defendant's mother.

Harriet Pierre, defendant's mother, testified for the defense that on January 2, Officer Severin came to her home and asked about her son, stating that he was a witness to a killing. The officer called on January 15, asking her to bring her son down about 4:30 p. m. the next day. She went into a room with her son, and the officer asked her to step out. She was at the station from 5:00 p. m. until 7:55 p. m. She saw a lineup but did not know what it was all about. About 7:55 she was told that she could see her son. At first he denied doing anything, but after the officer told him "you are fibbing," he admitted it. She had no other conversation with her son, and was taken home. Her son looked like he had been crying and looked scared.

Defendant testified that in January, he was working and living at home with his parents, sister and brother. He had never been arrested before. His mother received a phone call from a police officer about a shooting, and took him down to the station to see what it was all about. When they arrived at the station, a policeman took him into an office and started questioning him. No one told him that he had the right to an attorney, or that he could have his mother present. He remembered a lady coming into the office; just before she came in, the police told him to shut up. He was telling the officers that he didn't do it, that he had never seen the lady before, and

that he wanted to see his mother. When the officer told him to shut up, he became frightened and started to cry. There were four other persons in the lineup, one younger and the others about his age. After the lineup, he was taken back into the room and questioned further. His mother then entered the room.

On cross-examination, defendant testified that when he first arrived, he went to a room where there were about eight or ten policemen; they told his mother to get out. The woman who was to sign the complaint was also in the room. He asked for his mother about six or eight times, and was refused. After the lineup, he was taken back into the room. Officer Severin and the complaining witness were there. After the officer had finished typing the lady's statement, defendant's mother came in. He did not tell her that he did it.

The complaining witness testified for the State in rebuttal that on January 16, Officer Severin requested that she come to the police station. At the station, she identified defendant out of a lineup. A few minutes later, she went to Officer Severin's office, where she gave a statement. It took about a half-hour to forty-five minutes to give the statement. While she was being questioned, defendant first would say that he didn't do it and then would say that he did it, and that he was sorry. He asked her not to sign a complaint. At no time did she hear defendant ask to see his mother.

On cross-examination, the complaining witness testified that defendant asked to see his mother once or twice while her statement was being taken. She and her sister returned home from the station about 7:30 p. m.

The motion to suppress any oral statements made by defendant was denied by the trial court.

The following testimony was brought out at trial. Complaining witness testified that on November 22, 1965, she was single, and living with her sister and brother-in-law at 2245 West Lake Street, Chicago. At about 10:00 p. m.

287

she entered the building elevator and pushed the button for the twelfth floor. On the eighth floor, the defendant got on. He told her to put her hand on the open button, and then told her this was a stickup. He put a knife in her side and a dirty rag in her mouth. They walked upstairs to the ninth floor. He told her to face the wall, then took her money and phonograph records. He told her to take her clothes off and to get on the floor. He slapped her in the face when she wouldn't be still. He then had intercourse with her. After he left, she put her coat on and tried to catch him but failed. She went to her sister's apartment and called the police. She attended a lineup on January 15, but was unable to identify anyone. On January 16, she returned to view another lineup and at that time identified defendant. Three of the people in the lineup were about 17, and the fourth person was older. Afterwards, she gave a statement to Officer Severin in defendant's presence. The defendant cut in several times to state that he didn't do it. He then said that he did it, that he was sorry, and asked her not to sign a complaint. She married after the occurrence.

On cross-examination, she testified that she weighed 170 pounds. She had described her attacker as a male negro about 17 or 18 years old, and about five feet five and a half or five feet six inches. She did not believe that she told any officer that her assailant was five feet ten inches. He weighed about 130 pounds, and was wearing light colored khaki pants, a brown or beige cream colored three quarter length coat and a striped cap. She next saw the defendant in the early part of January at an A & P Food Store. She first heard his voice, then turned and looked at defendant. After looking at him, she told her sister, who was with her in the store, that was the man. Her sister knew defendant's nickname and had seen him in the neighborhood. She did not go to a hospital after the attack, nor did the police take any of her clothing. She never told anyone that she did not wish to

288

prosecute or sign a complaint. On December 8, she told Officer Severin that she was going to get married, and didn't want her husband to know anything about the incident.

Officer Thomas Munyon of the Chicago Police Department testified that about 10:15 p. m. on November 22, 1965, he was ordered to interview a rape victim. When they arrived, the complaining witness was sitting at the kitchen table, crying. She told them what had happened and described her assailant as being five nine to five ten, 130 to 135 pounds, dark complexioned, wearing a brown three quarter length coat and brown pants.

Officer James Severin testified that on January 16, defendant came to his office at about 4:40 p. m. The witness had told the mother that defendant was a witness to a shooting. Defendant, along with three other individuals, was placed in a lineup. Afterwards, the complaining witness gave a statement in defendant's presence. Defendant, after first denying it, admitted committing the crimes. His mother came in, and he also admitted the attack to her. The complaining witness told him on December 8 that she had seen the man who attacked her, working at the A & P. On November 25, she had told him that she was reluctant to sign a complaint against the offender.

For the defense, Alberta Harris testified that she lived next door to defendant and had known him for five years. She was at his home at about 9:00 p. m. on November 22, 1965, and talked with him. She left defendant's home about 9:15 or 9:30 p. m.

Harriet Pierre, defendant's mother, testified that her son was home on the evening of November 22, 1965. He went to bed about 9:00 or 9:30 p. m., and she went to bed about midnight. He was in bed when her neighbor came in.

Defendant testified that he was 17 years old at the time of trial. When he first arrived at the police station

on January 16, some police officers were bothering and teasing him, and told his mother to get out. One of the officers with Severin told him that they had his fingerprints on the elevator. He kept asking Officer Severin if he could see his mother, but was told to shut up. He never touched or bothered the complaining witness. He worked at the A & P in the afternoons for a while after Thanksgiving.

In rebuttal, the complainant identified a cap as the one defendant was wearing on the night of the attack.

Defendant contends that the trial court improperly admitted his oral statements into evidence. He argues first, that the failure of the police to allow him to see his mother after his request rendered all subsequent statements inadmissible, and secondly, that the statements should have been suppressed because they were coerced and involuntary. In contending that the failure of the police to allow him to see his mother after request rendered subsequent statements inadmissible, defendant relies on Escobedo v. Illinois, 378 US 478 (1964). There, the United States Supreme Court held that where a suspect requested and was denied an opportunity to consult with his attorney he was deprived of "the Assistance of Counsel" in violation of the Sixth Amendment; consequently no subsequent statement made by him could be used against him at trial. Defendant in the instant case seeks to extend the Escobedo doctrine to include the denial of a minor suspect's request to see his parent during interrogation.

In People v. Rosochacki, 41 Ill2d 483, 244 NE2d 136 (1969), defendant sought to suppress a confession which was made after he had been denied permission to see his priest. In upholding the admissibility of the confession, the court stated at page 491:

> "We find no implication in Escobedo that its protections relating to in-custody interrogation by police

290

were intended to apply to a defendant who seeks the assistance of anyone other than a lawyer."

■ The constitutional right sought to be protected by Escobedo is the Sixth Amendment right to the advice of an attorney. The constitution affords no right to the presence of anyone other than a lawyer trained to protect the legal rights of those accused. While the presence or absence of a parent or responsible adult during the interrogation of a minor suspect may be a factor affecting the voluntariness of a confession, there is no constitutional right to the presence of a parent. We find that the Escobedo doctrine is not applicable to a request for anyone other than an attorney.

■ Defendant also argues that his statements should have been suppressed because they were coerced and involuntary. It is fundamental that the voluntariness of a confession is a question for the trial judge, who must weigh the credibility of the witnesses, and his finding will not be disturbed unless contrary to the manifest weight of the evidence. People v. Kirk, 36 Ill2d 292, 222 NE2d 498 (1966). Whether a confession is voluntary depends upon the totality of circumstances. In determining the totality of circumstances, factors to be considered include illegal detention, its duration, relentlessness of the interrogation, disregard of rudimentary necessities, failure to warn defendant of his constitutional rights, defendant's age, experience and education. People v. Hester 39 Ill2d 489, 237 NE2d 466 (1968).

■■ In the instant case the trial court's determination that the statements were made voluntarily was not contrary to the manifest weight of evidence. The defendant was detained for less than three hours. Much of that time was spent in waiting for the complaining witness to arrive, in taking her statement and in conducting the lineup. Officer Severin testified that no one questioned defendant from the time Severin arrived at the station

at 4:45 p. m. until he commenced questioning him at about 6:45 p. m. He also testified that the interrogation was completed at 7:05 p. m. Moreover the complaining witness testified that the statements were made by defendant at a time when he was not even being questioned. Although 17 years of age and without previous arrest, an examination of the record reveals that he understood the questions and the proceedings. His comprehension is also indicated by his request to the complaining witness that she not sign a complaint against him. Defendant was not deprived of any necessities. He had made no charge of physical coercion, and it is evident that the statements were not obtained by psychological coercion. Although the police officer deceived defendant and his mother about the real purpose of the station visit, that action had no coercive effect in obtaining a subsequent statement from defendant. There was nothing improper in having defendant present after the lineup while the complaining witness was giving a statement to the police. Moreover, defendant's claim that, in Officer Severin's presence, some officer made the false charge that the police had obtained defendant's fingerprint from the elevator, was contradicted by Severin's testimony. The trial court properly found that the statements made by defendant were voluntary, and admissible in evidence.

Defendant also contends that he was not proved guilty beyond a reasonable doubt, arguing that the complaining witness's identification and testimony were insufficient to sustain the convictions.

 The testimony of one witness, if it is positive and the witness credible, is sufficient to convict, even though that testimony be contradicted. People v. Cox, 22 Ill2d 534, 177 NE2d 211 (1961). The adequacy of the identification raises a question of the credibility of the witnesses which is a matter for the determination of the trier of fact with a superior opportunity not only to hear the testimony of the witnesses but to observe their de-

meanor on the stand. People v. Jackson, 28 Ill2d 566, 192 NE2d 873 (1963). The complaining witness in the instant case had ample opportunity to observe the defendant from the time he entered the elevator until he left her. She testified that she saw him face to face as he talked to her in the elevator and several times as they walked in the hallway prior to the rape. Although her original description to the police as to defendant's height was not precisely accurate, her entire physical description of her assailant and the clothing he wore was accurate. Moreover, she identified defendant in a lineup which was conducted fairly, and was careful enough to view two lineups before identifying him. Defendant attempts to argue that her identification of him was formed solely from hearing defendant's voice in the store before she saw his face. However, the record reveals that when she heard the voice in the store, she turned and looked at defendant before telling her sister that it was the man. She did not identify him until she saw his face.

 The complaining witness' testimony was sufficient to prove defendant guilty beyond a reasonable doubt. Her testimony was clear and convincing, and corroborated by her immediate complaint to the police and by defendant's oral admissions. She was unable to make an outcry during the assault because of the gag in her mouth. When she did attempt to resist, she was struck in the face by the armed assailant. Although she denied that she was reluctant to sign a complaint, any hesitancy about prosecuting the charges was explained by her approaching marriage and her wish not to disclose the incident to her future husband. While the lack of medical examination of the rape victim and of an examination of her clothing are factors to be considered by the trial court, such omissions of themselves do not cast a reasonable doubt as to defendant's guilt.

 Finally, defendant argues that the alibi testimony offered in his behalf was unimpeached, and thus

raised a reasonable doubt of the guilt. Any conflicts in testimony were for the trial court to resolve, and it was not obliged to believe alibi testimony presented by the defense. People v. Jackson, 95 Ill App2d 28, 237 NE2d 858 (1968). Since the neighbor's testimony accounted for defendant's whereabouts only up to 9:30 p. m., and the crimes were committed at about 10:00 p. m., in a building only one block from defendant's residence, the only alibi testimony covering the period of the crimes was that of defendant and his mother. The trial court did not err in rejecting that testimony.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

DRUCKER, P. J. and ENGLISH, J., concur.