No. 2--05--1093          Filed: 3-30-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05--CF--583 |
| JOSH L. WESTMORLAND, | ) ) | Honorable Timothy Q. Sheldon, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

The State appeals the judgment of the trial court granting the motion of defendant, Josh L. Westmorland, to suppress as involuntary the statement he gave to police while in custody on March 15, 2005. We affirm, finding that defendant's statement was involuntary under the totality of the circumstances.

BACKGROUND

Defendant, who was born on January 8, 1988, was charged with various sexual offenses that allegedly occurred on March 6, 2005. Defendant filed a motion to suppress, asserting that his confession to police was coerced by their threats and inducements and by their refusal of his request to phone his mother or a lawyer prior to his interrogation. Defendant further asserted that he "did not make a knowing and intelligent waiver of his Miranda Rights." See Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

At the hearing on the motion to suppress, the State called Detective John Galason of the Carpentersville police department. Galason testified that, on March 15, 2005, between 11 and 11:20 a.m., he and fellow Carpentersville detective Todd Shaver arrived at defendant's house to investigate a complaint that defendant had sexually assaulted several girls. Both men were dressed in casual clothes and arrived in an unmarked squad car. They knocked at the door of the home and defendant answered. Galason told defendant that he and Shaver needed to talk with him and that he was under arrest. Defendant did not ask why he was under arrest and Galason did not volunteer the information. Galason testified that he had not obtained a warrant to arrest defendant. Galason also testified that he did not inquire if defendant's parents were home and made no effort to contact them.

Galason testified that he and Shavers placed handcuffs on defendant and drove him in their squad car to the police station. Galason testified that he did not speak to defendant during the drive, which took about three or four minutes. When they arrived at the police station, defendant was released from the handcuffs and taken to the only interview room in the station. The room was about 10 feet long and 10 feet wide, had fluorescent lighting, and was furnished with a table and two bench seats. The room had one door, which was made of metal and had a single window. The door locked automatically from the outside when shut and a key was needed to exit the room. After defendant was placed in the room, the detectives left him alone for about two to four minutes while Galason retrieved his police reports, paper, and pen.

Galason testified that, when he and Shaver returned, they sat down on the benches with defendant. Galason sat on the same bench as defendant while Shaver sat on the other bench. Galason testified that he read defendant his Miranda rights from a preprinted form. After affirming that he understood the rights, defendant signed a written Miranda waiver. The waiver was completed

at 11:30 a.m. Galason testified that, upon finishing the waiver, "[defendant] said he wanted to talk with his mom." Galason replied that defendant was "17 years old and he [did not] have the right to have his mom in the room while we are talking to him." Defendant repeated his request, and Galason repeated his reply. Galason testified that he knew at the time that defendant was 17 years old, because he had run a LEADS check on defendant's driver's license. Galason was also aware that defendant had been a student at a Dundee high school, but he did not believe that defendant was still attending high school at the time.

Galason testified that, after denying defendant's two requests to speak with his mother, Galason said they needed to speak about a case. Galason asked if defendant knew what case Galason had in mind, and defendant replied that it was "one of two things." Galason said, "I am pretty sure you know what case I want to talk to you about." Defendant responded that "it's about what happened with [N.]."[1] Galason then remarked that he had spoken to the four female alleged victims and wanted to get defendant's side of the story. Galason testified that defendant immediately began telling his version of the events. Galason stopped defendant at various points for clarification or to point out variances between defendant's account and those of the alleged victims. After defendant finished with his story, Galason obtained a written statement from him. Galason testified that about 60 minutes elapsed between the beginning of the interview and the point when defendant began writing his statement. Galason testified that the tone of the interview was "very casual" and that defendant's physical condition was "fine."

Galason testified that he gave defendant several options on how to produce the written statement, and defendant chose the question/answer method, whereby Galason would ask defendant

---

[1] The minor victim's initial is used to protect her privacy.

a question and then transcribe defendant's answer. Galason testified that this process took 30 minutes. After defendant's written statement was completed, Galason left the room and called the State's Attorney, who authorized charges against defendant. Galason then placed defendant in a jail cell. Defendant gave no further statements. Galason testified that the interview with defendant lasted a total of 90 minutes.

Galason testified that, during the course of the entire interview, defendant did not appear to have any difficulty understanding the questions and gave intelligent answers. The interview was "casual," and defendant did not become emotional but remained calm. Galason testified that he asked most of the questions because he had interviewed the alleged victims and was more familiar with the case than Shaver. Galason testified that he neither promised defendant that he would be released if he provided a statement nor threatened that he would be incarcerated if he did not provide a statement. Galason testified that he gave defendant a soft drink during the interview but did not recall whether he gave him anything to eat. Defendant was also allowed to use the restroom. Galason assumed, but could not specifically recall, that he had his firearm with him during the interview. Galason testified that, if he did have his firearm with him, he would not have placed it on the table in the interview room but would have kept it in its holster.

On cross-examination, Galason reiterated that, in response to defendant's request to speak to his mother, Galason told defendant that he did not have the right to have his mother in the room with him during the interview. Galason did not recall whether he told defendant that defendant had no right "to even talk to [his mother]." Galason acknowledged that he had the authority to allow defendant's mother to be present during the interview, but stated that he "didn't want" defendant's mother present. Galason denied that defendant ever requested to speak to an attorney before he gave

his statement. Galason also reiterated his denials that he made any promises or threats to defendant in order to obtain the statement. Galason further denied that Shaver made any threats or promises to defendant. Galason testified that he never led defendant to believe that there was a possibility that defendant might not be charged in connection with the victims' allegations. Galason testified that, no matter what defendant said during the interview, he had no intention of releasing defendant before he contacted the State's Attorney regarding charges. Galason also testified that no juvenile officer was present during defendant's interview.

Next, the State called Shaver. Shaver confirmed Galason's account of his and Galason's conduct toward defendant before, during, and after the interview. Significantly, Shaver testified that the tone of the interview was "casual, laid back, mere conversation." Shaver testified that defendant was calm during the interview. Shaver testified that neither he nor Galason made any threats or promises to defendant in order to obtain a statement. Although Shaver testified that it was "possible" that defendant might have been released based on what he told the detectives, Shaver denied that either detective ever led defendant to believe that he would be released if he gave a statement. Shaver further denied that he or Galason told defendant that they "didn't give a shit whether [defendant] gave a statement or not" or that "they would just throw him in a cell" if defendant did not provide a statement. Shaver testified that he kept his firearm in its holster during the interview and never placed it on the table in the interview room. Shaver testified that, after defendant was apprised of and waived his Miranda rights, he asked to speak with his mother. Galason refused the request, saying "something to the effect that [defendant] was old enough to speak with us, that [defendant] didn't need to call his mother." Shaver testified that defendant asked only once to speak with his mother. Shaver denied that defendant asked to speak with an attorney.

Following Shaver's testimony, the State rested, and defense counsel called defendant. Defendant testified that, on March 15, 2005, he was a junior in high school and was living with his mother and stepfather. He testified that he was home alone on that date, when Detectives Galason and Shaver came to his home sometime between 11:30 a.m. and 12 p.m. Galason informed defendant that he was under arrest but did not say why. Defendant was allowed to put on socks and shoes before he left the house with the detectives. Before placing defendant in the squad car, the detectives handcuffed him. On the way to the police station, Galason asked defendant if he knew why he was under arrest. Defendant replied that he had a suspicion. Galason then remarked that he had "talked to all the girls" and that defendant was "in pretty big trouble." Galason also said that they were "going down to the police station *** to be taking this and that." Defendant testified that he was "terrified" by these remarks.

Defendant testified that, when they arrived at the police station, he was released from his handcuffs and placed in a small interrogation room. The detectives left him there for about 20 minutes. He was still "very scared" when the detectives returned. Defendant noticed that both detectives were armed with handguns. Defendant testified that he was the first to speak when the detectives returned, and he made a request to contact either his mother or an attorney. Galason replied, "[W]e are not going to let you do that right now. *** [I]f you don't talk to us, if you don't cooperate, we are just going to put you in the jail cell until you do." Galason also said, "I don't really give a shit if you go to jail or not. I just want my evidence."

Defendant testified that Galason proceeded to advise him of his Miranda rights, and defendant signed a waiver of those rights. Asked if he understood the right to remain silent, defendant replied, "Yes. And I tried to remain silent but they wouldn't allow me the phone call."

Defendant testified that, after he signed the waiver, he made a second request to speak to his mother or an attorney, to which Galason replied, "I am sorry. You are not going to get a phone call." Defendant testified that Galason responded to both requests for a phone call in a raised voice. Defendant testified that he made the requests because he wanted "to get advice as to what to do." Defendant testified that Galason's threat to place defendant in a jail cell unless he cooperated led him to believe that, if he gave a statement, he would be released. Defendant admitted, however, that neither detective expressly told him that he would be released if he made a statement.

Defendant testified that he proceeded to give a statement because he was "scared," "didn't think [he] had a choice in the matter," and "didn't know what to do." Defendant testified that, though he was frightened, he did not cry during the interview. Defendant admitted that he never told the officers that he did not want to speak to them. After he gave the statement, defendant was allowed a phone call, and he phoned his mother. Defendant testified that the interview lasted a total of 90 minutes, exclusive of the 20 minutes he spent alone in the interrogation room. Defendant was given a soft drink and allowed to use the bathroom during the interview. Defendant testified that he had never been arrested before that day.

Prior to the arguments of the parties, the trial court remarked that it felt it "important" to describe defendant's physical characteristics for the record:

"I know that he is 17 year [sic] old. He appears not to be a very mature 17. He strikes the court as being somewhat immature, a little bit pudgy with rosy cheeks. He does not look like a mature high school senior, some of which are already growing beards and muscular.

*** [Defendant] does not appear to be physically mature."

Following the arguments of the parties, the trial court again referenced defendant's physical makeup and now contrasted it with that of Detective Galason:

"The Court observed that Detective Galason was a very imposing figure. He is well over six feet tall. He is well over 200 pounds. He has a military-style crew cut haircut. He is physically fit and muscular. He appears as a dominant personality.

The Court observed that the Defendant *** as [sic] an immature boy. He is pudgy. He is rosy cheeked. He is under six feet tall. He is wide-eyed. He appears frightened. He has no noticeable facial hair."

The trial court determined that defendant's confession was involuntary. After summarizing the testimony of each of the three witnesses, the trial court noted that the voluntariness of a defendant's confession is to be evaluated under the totality of the circumstances. See In re J.J.C., 294 Ill. App. 3d 227, 234-35 (1998). The trial court quoted this court's comment in J.J.C. that "[t]he presence or absence of a parent is a factor to consider when determining the voluntariness of a confession." J.J.C., 294 Ill. App. 3d at 235.

The trial court then set forth its findings of fact. With respect to the credibility of the witnesses and the consistency of their testimony, the trial court remarked:

"All the witnesses appear to be credible witnesses. The testimony of the three witnesses is consistent with the exception that the Defendant requested the right to speak to an attorney. The detective testified Defendant appeared calm. The Defendant testified that he was scared."

The trial court then made the following findings corresponding to the various factors of the voluntariness test:

"Age. In this case the Defendant was only two months past age 16, and he was almost a juvenile.

Education. He testified that he was halfway through his junior year of high school. He appears intelligent. The duration of questioning was one-and-one-half hours. He was given his constitutional rights.

Physical punishment. He was handcuffed in the car and was abandoned in the interrogation room.

Deception. He was under the impression that maybe if he cooperated, he would get to go home.

Threats. The officer said to him, 'I don't give a shit if you go to jail or not.'

Was his confession given freely? The Court would believe no.

Was it given without inducement? He was in the mental framework that maybe he could go home and the charges would go away if he talked to the police.

Was his will overcome? Yes.

Mental ability appears to be no problem.

English language. He speaks plain English.

He has prior experience with the criminal law? None.

Condition and surroundings of the interview area. There were two policemen and the Defendant in a closed off room. The door was closed and locked. There was only one small window and the door.

The condition of the interrogators. At least Detective Galason was big and intimidating. He had his weapon on and he raised his voice.

-9-

Alcohol, drugs or medication. None.

Emotional state of the Defendant was scared.

Mental state of the Defendant was terrified. He wanted his mother.

The issues answered in this case are:

(1) The Court finds that the State proved by a preponderance of the evidence that Defendant did not request permission to speak to an attorney. Both detectives said he never requested permission to speak to an attorney. The Court doubts that in the Defendant's youthful naivete, [sic] the sophistication or knowledge to request an attorney.

(2) The Court finds that the Carpentersville police coerced the Defendant into giving a statement. He was intimidated. He was denied the right to call his mother. It was the Defendant's youthful fantasy that he would be allowed to leave if he talked. It was the Defendant's youthful fantasy that the charges would go away if he talked, and the detectives wouldn't raise their voices if he talked.

(3) The Court finds that Defendant's will was overborne by the Carpentersville Police Department. The Defendant was only two months past age 16. He is a very immature 17-year-old. There were policemen with guns. The call to his mother was refused. The officers raised their voices. He was alone with the two officers in a very small room. The one officer was a big, military-type interrogator.

The Defendant had no prior criminal law experience. The Defendant in his youthful

fantasy thought he could go home if he cooperated. The Defendant in his youthful fantasy thought that the charges would go away when he cooperated. The psychological dominance was evident in this case.

(4) The Court finds that Defendant did not knowingly, intelligently and voluntarily waive his right to remain silent.

Considering all the factors and the totality of the circumstances, the Court finds that statement to be in violation of the Defendant's constitutional right to remain silent. Therefore, the motion to suppress statement is granted."

The State filed a certificate of impairment and a timely notice of appeal.

ANALYSIS

We apply a bifurcated standard of review to a trial court's decision as to whether a defendant's confession was voluntary. We accord great deference to the trial court's findings of fact and will disturb them only if they are against the manifest weight of the evidence. In re G.O., 191 Ill. 2d 37, 50 (2000). However, we review de novo the ultimate question of whether the confession was voluntary. G.O., 191 Ill. 2d at 50.

The due process clause of the fourteenth amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law" (U.S. Const., amend. XIV). The United States Supreme Court has held that by virtue of the clause, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109, 88 L. Ed. 2d 405, 410, 106 S. Ct. 445, 449 (1985). "In addition to these Federal voluntariness principles, a confession must also be voluntary in a State-law sense." People v. Scott, 148 Ill. 2d

479, 509 (1992). Under federal law, a confession is voluntary unless it is causally connected to coercive police conduct (see Colorado v. Connelly, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986)), but under Illinois law, a confession may be deemed involuntary in the absence of police misconduct, based entirely on the defendant's personal characteristics (see People v. Bernasco, 138 Ill. 2d 349, 368 (1990) (confession involuntary because of defendant's subnormal intelligence)). Thus, "the issue of whether the confession is coerced for Federal constitutional purposes differs from the issue of whether the statement was voluntary." People v. Rogers, 246 Ill. App. 3d 105, 113 (1993). In determining whether a confession was voluntary, courts consider the totality of the circumstances. G.O., 191 Ill. 2d at 54. Relevant factors include: (1) the personal characteristics of the defendant, such as his age, education, intelligence, prior experience with the criminal justice system, and physical and emotional condition at the time of the questioning; (2) the legality and duration of the questioning, including any Miranda advisory; and (3) any physical or mental abuse, threats, or promises by the police. J.J.C., 294 Ill. App. 3d at 234.

No single factor is determinative. J.J.C., 294 Ill. App. 3d at 234. The factors must be applied in light of the following general principles:

"The test for voluntariness is not whether the accused wanted to confess or would have confessed in the absence of interrogation. Suspects typically do not confess to the police purely of their own accord, without any questioning. [Citation.] Rather, the test of voluntariness is whether the defendant made the statements freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." People v. Gilliam, 172 Ill. 2d 484, 500 (1996).

The State must prove by a preponderance of the evidence that the defendant's confession was voluntary. People v. Braggs, 209 Ill. 2d 492, 505 (2003).

Before engaging in the voluntariness inquiry, we must first address some aspects of the trial court's factual findings. Neither party questions any of those findings, but there are some perplexities in them just the same. The first concerns the trial court's general findings of credibility. The trial court found all three witnesses credible yet also identified conflicts between the detectives and defendant over whether defendant requested an attorney during the interrogation and whether he was "calm" or "scared" during the interview. Obviously, not all the witnesses could have been credible on these points, and so the trial court's general credibility finding must be read as qualified. The trial court implicitly resolved the foregoing conflicts, finding that defendant was "scared" during the interview but that he did not ask for an attorney at any point.

There also appears to be a tension between certain of the trial court's implied findings. The detectives disagreed with defendant over whether Galason threatened to incarcerate defendant if he did not provide a statement. In the portion of its findings labeled "Threats," the trial court did not find that this threat occurred, but did find that Galason raised his voice to defendant and said, "I don't give a shit if you go to jail or not." In the section labeled "Deception," the trial court found that defendant believed he would be released if he gave a statement. Defendant, however, testified that this belief was an inference from the threat of incarceration that he claimed Galason made. Yet, as just noted, the trial court implicitly found that Galason did not make this threat. We need not attribute an inconsistency to the trial court, however. Rather, we may presume that the trial court found that defendant believed he would be released if he gave a statement, and also found that this belief did not arise from any threat of incarceration by Galason, because Galason made no such

threat. There remains, however, the oddity of the trial court attributing defendant's belief to "Deception" without identifying what deceptive conduct by the police might have led to this belief. Elsewhere in its findings, the trial court referred to this belief as a "youthful fantasy," implying that it had its genesis entirely in defendant's own mind. Indeed, none of the witnesses testified to any kind of deceptive conduct, and defendant never claimed that the detectives told him he would be released if he gave a statement.

The last point we must address regarding the trial court's factual findings concerns the various specific remarks that defendant claims Galason made in the squad car and during the interview. The only such remark that the trial court referenced in its findings was the comment, "I don't give a shit if you go to jail or not." The remainder of the alleged remarks are not critical to the trial court's decision, so we assume that the court implicitly found that Galason did not make them.

Applying the relevant factors to the facts as found by the trial court, we conclude that the State did not prove by a preponderance of the evidence that defendant gave his statement voluntarily. Some of defendant's personal characteristics at the time of the questioning weigh in favor of admissibility. Though, at 17 years of age, defendant was young, he was nearly the age of majority, which in Illinois is 18 years of age (755 ILCS 5/11--1 (West 2004)). See People v. Primm, 319 Ill. App. 3d 411, 419 (2000) (relevant for voluntariness inquiry that defendant was 16 years old and thus had "nearly reached majority age"). Moreover, defendant was intelligent, had normal mental capacity, and was not under the influence of alcohol or drugs or suffering from any physical or emotional infirmities when he was taken into custody. Defendant became "scared" while in custody, but this hardly distinguishes him from the general run of arrestees. (Of course, defendant's claim that these emotions were the result of oppressive tactics by the detectives is a separate issue, which we

take up below.)  Defendant's lack of experience with the criminal justice system also fails to distinguish him in any significant way.  A defendant can compensate for a lack of such experience with his natural gifts, such as intelligence, which can assist him in handling a novel situation.  The trial court found defendant to be intelligent, and our review of his testimony confirms this judgment.

There are, however, aspects of defendant's personal makeup that weigh in favor of inadmissibility.  The trial court found defendant "not to be a very mature 17," but to be "somewhat immature."  The court described him as "wide-eyed," "frightened," and "pudgy."  These characteristics suggest vulnerability, and the impact of any pressure by the police must be measured with them in mind.

Next, we consider the nature of the custody and interrogation.  The trial court found that defendant was subjected to "physical punishment" in that he was handcuffed on the way to the police station and then "abandoned" in the interrogation room.  The detectives did not testify why they handcuffed defendant, but given that they released him from the handcuffs upon arriving at the station, it appears that the restraints were a safety precaution rather than a means of coercion or "physical punishment."  We recognize, nonetheless, the psychological impact that the handcuffing may well have had on defendant, given his youth and lack of experience with the criminal justice system.  However, the handcuffing is not dispositive of the voluntariness inquiry, but is just one of several circumstances that we must consider.  Other aspects of the interview indicate that defendant was decently treated:  he was given a soft drink and allowed to use the restroom.  The detectives were armed during the interview, but kept their guns in their holsters.

Additionally, the interview lasted a total of 90 minutes, which was not an unreasonable length of time. The trial court found that defendant was "abandoned" in the interrogation room, but the court did not address the conflict in the testimony over how much time he spent alone in the room. Defendant testified that he was left alone for 20 minutes, but Galason claimed it was between 2 and 4 minutes. Even if we assume that the trial court believed defendant, we cannot consider 20 minutes spent alone in an interview room tantamount to an "abandonment." Moreover, because the trial court apparently did not reject Galason's claim that he used the time to gather materials for the interview, we do not see what basis the trial court might have had for considering it a means of "physical punishment."

There were, however, some quite unsettling aspects of the interrogation. The officers made no attempt to locate defendant's parents when they arrested him and also denied his two requests during the interview to speak to his mother. Defendant was "immature" for his age and "wide-eyed." With defendant already vulnerable from the complete denial of parental contact, Galason raised his voice during the interview and said, "I don't give a shit if you go to jail or not." This was the conduct that, in the trial court's words, "terrified" defendant. Under the totality of the circumstances, which encompass both defendant's individual psychological makeup as well as the officers' conduct, we agree with the trial court that defendant's will was overborne.

The State argues that it is improper for us to consider the "parental factor," as we call it for now. The State refers to section 5--405 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-- 405 (West 2002)). Subsection (2) of that section provides:

"A law enforcement officer who arrests a minor without a warrant *** shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other

person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where the minor is being held."

"The purpose of the notice requirement is to permit, where possible, a parent to confer and counsel with the juvenile before interrogation." People v. Williams, 324 Ill. App. 3d 419, 429 (2001). As the State notes, section 5--405 and the other "procedures *** for the investigation, arrest and prosecution of juvenile offenders shall not apply to minors who are excluded from jurisdiction of the Juvenile Court." 705 ILCS 405/5--130 (West 2002). Defendant does not fall under the Act because he was over 17 years of age when he committed the alleged offenses. See 705 ILCS 405/5--120 (West 2002) ("Proceedings may be instituted under the provisions of this Article concerning any minor who prior to the minor's 17th birthday has violated or attempted to violate, regardless of where the act occurred, any federal or State law or municipal or county ordinance").

The Act, however, does not restrict the factors to be considered under the common-law/constitutional voluntariness inquiry, which, after all, encompasses the totality of the circumstances. Courts applying the voluntariness test have long recognized a factor similar in content to section 5--405(2) but grounded in common-law/constitutional sources rather than statutory authority. The early cases address the situation where a parent of the defendant was foreclosed from consulting with the defendant during a police interview. Examples include People v. Hopkins, 247 Ill. App. 3d 951 (1992), vacated on other grounds, 151 Ill. 2d 570 (1993); People v. Starling, 64 Ill. App. 3d 671 (1978); People v. Smith, 56 Ill. 2d 328 (1974); and People v. Pierre, 114 Ill. App. 2d 283 (1969).

In Pierre, the earliest in this line of cases, the police phoned the defendant's mother and made some inquiries about him. They told the mother that the defendant was a witness to a killing. This

was a pretext, because the police were in fact investigating the defendant for rape. Two weeks later, the police summoned the defendant, who was 17 years old, to the police station. His mother accompanied him. When they arrived, they were escorted to an interrogation room but the mother was asked to leave. After the defendant waited in the room for about two hours, the police entered and began questioning him. During the interview, which lasted about 20 minutes, the defendant asked to see his mother but was refused. The defendant gave incriminating statements during the interview. He later moved to suppress the statements, but the trial court denied the motion. On appeal, the defendant argued that the statements should have been excluded because "the failure of the police to allow him to see his mother after his request rendered all subsequent statements inadmissible," and, alternatively, because the statements "were coerced and involuntary." Pierre, 114 Ill. App. 2d at 290. In support of the first argument, the defendant cited cases construing the right to counsel under the sixth amendment (U.S. Const., amend. VI). The court rejected this argument:

> "The constitution affords no right to the presence of anyone other than a lawyer trained to protect the legal rights of those accused. While the presence or absence of a parent during the interrogation of a minor suspect may be a factor affecting the voluntariness of a confession, there is no constitutional right to the presence of a parent." (Emphasis added.) Pierre, 114 Ill. App. 2d at 291.

The court also rejected the defendant's claim that his statements were involuntary. The court noted that, though the defendant was only 17 years old and had no criminal history, the interrogation was relatively brief, he was not subjected to psychological or physical coercion or "deprived of any necessities," and the deception that the police had employed to get the defendant and his mother to the police station "had no coercive effect in obtaining a subsequent statement from defendant."

Pierre, 114 Ill. App. 2d at 292. Interestingly, though the court previously recognized the parental factor as having potential relevance to the voluntariness inquiry, it did not actually mention the factor in its voluntariness analysis.

The parental factor was, however, given vigor in Starling. The defendant, who was 18 years old, was awakened in his home at 5:30 a.m. by the police, who arrested him for burglary. As the police were advising the defendant of his Miranda rights at the police station, his father entered the room and told him not to say anything to the police until he had an attorney. The defendant nodded his head and said, "Okay." The police then asked the father to leave the room, and he did. The police continued to question the defendant, at one point telling him "that he might as well tell everything he knew because [they] knew that he was involved in the incident." Starling, 64 Ill. App. 3d at 675. The defendant gave a written statement, which he later moved to suppress on the ground that it was involuntary under the totality of the circumstances. The trial court granted the motion, and the appellate court affirmed. The court noted that the defendant was young, had no prior experience with the criminal justice system, had been awakened early in the morning following a night of drinking and only a few hours of sleep, and typically had difficulty awakening when tired. The court also found that the police created a vulnerable situation for the defendant by expelling his father from the interview room and subsequently exploited that vulnerability by encouraging the defendant to "tell everything he knew because [they] knew that he was involved in the incident." Starling, 64 Ill. App. 3d at 675. The court held that the police's behavior undermined the effect of the prior Miranda advisory, a factor relevant to the voluntariness inquiry. See J.J.C., 294 Ill. App. 3d at 234. The court held that, though a defendant has no fifth amendment right (U.S. Const., amend. V) "to the presence of a parent during interrogation," "ejection of [the defendant's] father

-19-

after the warning about consulting an attorney could well have signaled to the defendant that to have asserted his right to remain silent would have been futile for the officer was determined to obtain a confession." Starling, 64 Ill. App. 3d at 675.

In Smith, the 19-year-old defendant was arrested for aggravated battery. While in custody, he called his father and asked him to provide bail. When the father arrived at the police station, the police informed him that he could not yet post bail because the investigation was still pending. When the father returned several hours later, he was informed that the defendant was charged with murder, a nonbailable offense. Several hours later, after the defendant provided oral and written statements, he was allowed to see his father. Smith, 56 Ill. 2d at 332. The defendant moved to suppress the statements on the ground that they were made "before he had an opportunity to consult with his father." Smith, 56 Ill. 2d at 331. The trial court denied the motion, and the supreme court affirmed, reasoning:

:    "The defendant did not ask to see his father until after he had made an oral confession at about 6:30 P.M., and it is undisputed that the officers attempted to reach him by telephone, but were unable to do so immediately. As a result of their efforts, however, the defendant's father arrived at about 8:00 P.M. while the written confession was being taken by an assistant State's Attorney. He was not allowed to talk to the defendant until that statement was completed. In our opinion the absence of the defendant's father did not render his confession involuntary." Smith, 56 Ill. 2d at 332.

The defendant also claimed that, before he confessed, one of the officers said he " 'would be taken downstairs' " if he did not give a statement, and the officers assured him that a confession could not be used against him unless he signed it. Smith, 56 Ill. 2d at 332. The court discounted these

accusations because the police denied them and the defendant's father testified that his son did not complain about the way the police had treated him. Smith, 56 Ill. 2d at 332.

In Hopkins, the 17-year-old defendant was in custody for approximately 20 hours before giving a written confession. During his detention, the defendant's mother arrived but was not allowed to see him. The defendant moved to suppress his confession as involuntary. The appellate court upheld the denial of the motion. As for the significant length of the detention, the court noted that "[c]onfessions made after long periods of detention have been found to have been voluntary" and also that "defendant was not subjected to long interviews, but was instead questioned for brief intervals with long rest periods between those interviews." Hopkins, 247 Ill. App. 3d at 961. The court also noted that the defendant was given food and drink and was allowed to use the restroom. The court further determined that there was "ample evidence that defendant was not physically or psychologically abused prior to making his confession." Hopkins, 247 Ill. App. 3d at 961. Though the defendant claimed that he gave his written statement only after being beaten by police, who bloodied his nose, he admitted that a photograph taken before he gave his written statement showed no signs that his nose was swollen or bleeding. The court also noted that the officers denied beating him or making any attempt "to overpower [his] will prior to his confession," and that an assistant State's Attorney, who had asked the defendant in private whether he had been treated well by the police, testified that the defendant made no complaints. Hopkins, 247 Ill. App. 3d at 962. As for the refusal by the police to let the defendant's mother see him, the court explained that "the presence or absence of a parent is only one factor in determining whether a confession was voluntary within the totality of the circumstances" and "[i]n Illinois, a juvenile does not have a per se right to consult with a parent before or during police questioning." Hopkins, 247 Ill. App. 3d at 962.

This line of cases is remarkable in two respects. For one, there is a demonstrable evolution of the parental factor from <u>Pierre</u> through <u>Hopkins</u>. In <u>Pierre</u>, the factor is recognized in a passing and noncommittal manner and does not figure explicitly in the court's voluntariness analysis. In <u>Starling</u>, the factor is given force but its nature is left somewhat unclear, because the court's voluntariness inquiry seems to merge with a <u>Miranda</u> analysis. However, in <u>Smith</u> and <u>Hopkins</u>, the factor emerges as a full-fledged consideration in the voluntariness analysis. It is also notable that none of these cases mentions section 5--405(2) of the Act or its predecessors; rather, they derive the parental factor from common-law or constitutional considerations.

The existence of a nonstatutory parental factor running parallel to, yet independent of, section 5--405 and its predecessors explains why even some more recent cases examining the voluntariness of confessions from "juveniles" who are subject to the Act do not allude to section 5--405 or its predecessors in stating or applying the parental factor. See, <u>e.g.</u>, <u>G.O.</u>, 191 Ill. 2d at 54-55; <u>J.J.C.</u>, 294 Ill. App. 3d at 235. The supreme court's remarks in <u>G.O.</u>, a 2000 case, are especially revealing on this point:

> "[W]e have recognized that the taking of a juvenile's confession is 'a sensitive concern.' [Citation.] Because of this, the 'greatest care' must be taken to assure that the confession was not coerced or suggested and that ' "it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." ' [Citations.] Because of this concern, the appellate court has also recognized an additional factor that is not present in cases involving adults. This factor, commonly known as the 'concerned adult' factor, considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare. [Citations.] Other facets to this factor include whether the police

prevented the juvenile from conferring with a concerned adult and whether the police frustrated the parents' attempt to confer with the juvenile." G.O., 191 Ill. 2d at 54-55. The court, interestingly, does not even cite section 5--405 here but instead appears to credit the appellate court with the development of the parental factor, which by the time of G.O. has evolved into the "concerned adult" factor. That is, the presence of a juvenile officer may now compensate for the absence of a parent. See In re A.R., 295 Ill. App. 3d 527, 533 (1998). We think it is entirely appropriate for courts to apply the "concerned adult" factor to confessions from individuals who are not "minors" subject to the Act. As we stated above, the Act does not limit the factors courts may consider under the common-law/constitutional voluntariness test.

Notably, the nonstatutory manifestation of the concerned adult factor lacks the strict age-based restrictions of its section 5--405(2) counterpart and is applied without regard to the age of the defendant at the time of the alleged crime. The defendant in Smith, for instance, was quite obviously over 17 when he committed the offense. An interesting consequence of the Act is that if the accused commits a crime the day he turns 17, the police have no obligation under the Act to attempt to notify a parent or other concerned adult that the accused has been arrested, and in fact may affirmatively hinder such a third party from contacting the accused. If, however, the crime was committed just one day before, the Act not only bars the police from frustrating the efforts of a parent or other concerned adult to speak with the accused, but also obligates them to take affirmative steps to notify a parent or concerned adult of the arrest. Under the nonstatutory voluntariness test, the applicability of the concerned adult factor does not hinge on the span of a day in an individual's teenage years, because teenagers do not mature in the span of a day. The more fluid limits of the nonstatutory

concerned adult factor jibe with the fact-specific nature of the voluntariness test, and with the reality that persons mature at more varying rates during teenage years than perhaps any other period of life.

With these considerations in mind, we compare the above cases with the present case. In Pierre, Hopkins, and Smith, the court found that the confession was voluntary even though the defendant was not allowed to speak to a parent during the interrogation. These cases are all readily distinguishable from the present case. First, and most generally, in none of these cases did the trial court remark upon the psychological maturity of the defendant, but here the trial court expressly found that defendant was immature for his 17 years of age.

There are other differences as well. In Smith, there was no evidence of any pressure applied to the defendant, apart from the denial of parental contact. Here, not only was defendant two years younger than the defendant in Smith, but the trial court expressly found that there was coercive effect to Galason's raising his voice and saying, "I don't give a shit if you go to jail or not." In Pierre, the police did employ a measure apart from the denial of parental contact, in that they deceived the defendant and his mother about the nature of their investigation. Although the appellate court's opinion did not describe any of the trial court's factual findings, it is reasonable to presume that the appellate court was relying on an express or implied finding by the trial court when it concluded that the deception had no coercive impact on the defendant. Here, by contrast, there was a finding of coercion apart from the denial of parental contact. Additionally, in Pierre the mother accompanied the defendant to the station. Here, defendant was not afforded such company nor did the police make any effort to contact his parents.

As for Hopkins, the appellate court specifically noted that there was "ample evidence that defendant was not physically or psychologically abused prior to making his confession" (Hopkins,

247 Ill. App. 3d at 961). The court also found that the length of the detention was ameliorated by the sporadic nature of the interrogation. Hopkins is distinguishable because here the trial court made a specific finding of psychological coercion, and therefore the detention, though much briefer than that in Hopkins, was arguably more intense.

Starling is the only case in the Pierre-Hopkins line where the trial court suppressed the defendant's confession. Defendant suggests that, just as in Starling "the ejection of [the defendant's] father from the room signaled to the defendant that resistance to the police would be futile," so here the refusal by the police to grant defendant's two requests to contact his mother led him to "fe[el] it useless to resist the police." Notably, defendant was the same age as the defendant in Starling, but the difference is that defendant was found to be psychologically immature for his age. It may be a matter for debate how the impact of depriving a 17-year-old of all parental contact compares to affording him the comfort of a parent's presence for a time only to take it away abruptly. Even if the tactic used in Starling should be considered more egregious, we think the impact here was at least equal, given defendant's maturity level.

The present case is also similar to In re V.L.T., 292 Ill. App. 3d 728 (1997), and People v. Knox, 186 Ill. App. 3d 808 (1989). In V.L.T., the 10-year-old respondent was interviewed twice within a 12-hour period. She was first brought to the station for questioning at 10 p.m. Her grandmother followed her to the station. The respondent asked to see her grandmother during the interview, but the police refused. About 3½ hours later, after she had given some statements that were not recorded, the respondent was allowed to see her grandmother. In the early morning hours, the respondent was released into the grandmother's care. During their time together, the grandmother advised the respondent to tell the truth. A few hours later, at 12 p.m., the respondent was awakened

in her home by the police and, before she could change out of her pajamas, was brought back to the station for further questioning. The respondent asked again to speak to her grandmother, and the police replied that they would call the grandmother after the interview. The police never did call the grandmother. The respondent was read her Miranda rights and waived them. After about 20 minutes of questioning, during which time a juvenile officer was present, the respondent gave a written confession. She had not eaten since the prior morning. V.L.T., 292 Ill. App. 3d at 729-34.

The appellate court held that the respondent's confession was involuntary. The foremost consideration for the court was the police's failure to honor the respondent's request to contact her grandmother during her second interview:

"[W]e conclude that the trial court improperly denied respondent's motion to suppress her statement. We find that the absence of an adult interested in respondent's welfare, such as her grandmother, especially after respondent asked for her grandmother, contributed significantly to the coerciveness of the circumstances surrounding the confession. [Citations.] In addition, since respondent had little prior contact with the police, there is no indication that she recognized the significance of the position of a juvenile officer or took any special comfort in one's presence. Furthermore, the record establishes that much of the police officers' conduct, particularly in rushing respondent to the station and keeping her separate from her grandmother, suggests the police attempted to coerce a confession from a very young and vulnerable suspect without consideration for her general welfare.

Other factors making up the totality of the circumstances include respondent's lengthy detention within the preceding 12-hour period, respondent's lack of any meaningful rest prior to the Sunday session, and the fact that respondent had little, if any, opportunity to

eat prior to the time she wrote her confession. Unquestionably, respondent was a child of extreme youth, tired, hungry, frightened, and, most likely, humiliated to be wearing her pajamas in a police station while being questioned by adult authority figures. The coercive potential of questioning her under these circumstances is obvious." V.L.T., 292 Ill. App. 3d at 737.

The court concluded:

"When all of these factors are combined with the fact that respondent's grandmother, or someone truly interested in her welfare, should have been present and able to confer with her before she wrote her confession in light of her request [citation], it is clear that the police failed to exercise the proper care to ensure that respondent's statement was not coerced." V.L.T., 292 Ill. App. 3d at 737.

In Knox, the 15-year-old defendant was arrested in his home. Also at home were the defendant's father and the defendant's four younger siblings. His mother was at a restaurant. After arresting the defendant, the police told the defendant's father that he was allowed to accompany the defendant to the police station. However, the father was not able to leave the house because he was looking after the defendant's younger siblings. The defendant's mother arrived home later and was told of the arrest. At the station, the police interviewed the defendant for about 45 minutes. About 15 minutes into the interview, the defendant's mother arrived at the station but was told by a detective at the front desk that she was not allowed to see the defendant. After the interview, the detectives spoke to an assistant State's Attorney, who then came to the station. The defendant was interviewed again for about 15 to 20 minutes, during which time he gave a confession. The defendant's two interviews lasted about an hour combined, but he was at the police station for nearly

five hours. He was read his <u>Miranda</u> rights before each interview, but no juvenile officer was present during either interview. The defendant did not ask to see his mother during his time at the police station. Thomas Skol, one of the detectives who interviewed the defendant, testified that he did not recall whether the defendant's mother arrived at the police station during the interviews, but Skol agreed that she might have been there. Skol also testified that he did not inquire at the front desk whether anyone had come to see the defendant. <u>Knox</u>, 186 Ill. App. 3d at 809-12.

The appellate court held that the defendant's confession was involuntary. The court was "not satisfied that the requisite care was exercised to assure defendant's statement was not [sic] free of compulsion." <u>Knox</u>, 186 Ill. App. 3d at 813. The court noted that it was "most concerned that defendant's statement was made before defendant had an opportunity to confer, prior to questioning, with an adult interested in his welfare, either his parents or a juvenile officer." <u>Knox</u>, 186 Ill. App. 3d at 813. The court found that the police's offer to allow the defendant's father to accompany him to the station was "empty" because the father's child-care obligations did not permit him to leave the home. The court also found that "the police contributed significantly to eliminating any opportunity defendant had from [sic] speaking to his mother at the police station." <u>Knox</u>, 186 Ill. App. 3d at 813. The court acknowledged that there was a factual dispute over whether the detectives who interviewed the defendant were aware that his mother had come to the station. However, the court found that, even if the police did not intentionally keep the defendant from his mother, they still failed to exercise "the great care required where a juvenile's incriminating statement is received." <u>Knox</u>, 186 Ill. App. 3d at 814. The court said:

"At worst, the police purposely precluded defendant's mother from contact with defendant by neglecting to see if defendant's mother had arrived until after such time as defendant had

completed his confession. At best, the police simply subjected defendant to the same routine questioning of a criminal suspect without special regard for his youth. Either scenario is impermissible and casts some doubt over the voluntariness of defendant's statement." Knox, 186 Ill. App. 3d at 814.

The court found that the failure of the police to have a juvenile officer present during the interviews compounded the problem:

"That failure, in view of the failure to permit defendant's mother an opportunity to see her son at the police station, deprived defendant of his only chance to consult with any adult interested in his welfare prior to making a statement. Such is not the type of sensitivity to be accorded to receipt of a minor's statement." Knox, 186 Ill. App. 3d at 816.

Of course, there are factual differences between these two cases and the case at bar. V.L.T. is the more different of the two but still carries much force here. Though we cannot discount the age difference between the respondent in V.L.T. (10 years) and defendant (17 years), we note the trial court's finding that defendant was "immature" for his age and "wide-eyed." Also, though defendant was not subjected to the humiliation or physical deprivation suffered by the respondent in V.L.T., the trial court did specifically find that defendant was "terrified" during the interview. Indeed, there was evidence of coercion here that was not present in Knox or V.L.T. In neither of those cases was there a suggestion that the demeanor of the police contributed to the pressure on the minor, but here the trial court specifically found that Galason's conduct "terrified" defendant.

Also, defendant had no opportunity to consult with a parent or other concerned adult before his interview, unlike the respondent in V.L.T., who spoke with her grandmother between her two interviews, the latter of which included her written confession. Of course, unlike in V.L.T. and

Knox, there was no police frustration of a concerned adult's attempt to contact defendant, but neither did the police make any effort to notify defendant's parents that he had been arrested. In V.L.T., the absence of the respondent's grandmother at the respondent's second interview was material in evaluating the voluntariness of her confession at the interview, even though the grandmother did not attempt to contact the respondent before or during the interview. Likewise, the court in Knox held that, even if the police were ignorant of the mother's presence at the police station during the interview, they nonetheless failed to show "the great care required where a juvenile's incriminating statement is received." Knox, 186 Ill. App. 3d at 814.

In G.O., our supreme court said that "a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation." G.O., 191 Ill. 2d at 55. V.L.T. and Knox, however, illustrate that courts place an emphasis on the "concerned adult" factor where the police fail to honor a minor's request to speak to a parent before or during an interview or where the police are indifferent to or intentionally frustrate a parent's own efforts to contact the minor. See People v. Morgan, 197 Ill. 2d 404, 440 (2001) ("The 'concerned adult' factor is particularly relevant in situations where a juvenile has demonstrated trouble understanding the interrogation process, has asked to speak with either his parents or a concerned adult, or where the police have prevented the juvenile's parents from speaking with him (emphasis added)).

Here, the police refused defendant's two requests to contact his mother and made no effort themselves to contact defendant's parents before or during the interview. As in Knox, there was no juvenile officer present during the interview to offset the absence of a parent. We recognize that defendant was given Miranda warnings and did not receive any promises or threats. The same,

however, was true of the respondent in <u>V.L.T.</u> and the defendant in <u>Knox</u>, but in neither case did this fact override the coercion that the court found in the remaining circumstances. Likewise, the provision of <u>Miranda</u> warnings and the absence of promises or overt threats did not ameliorate the pressure brought to bear on defendant, a 17-year-old who was "immature" for his age and became "terrified" while in custody when his two specific requests to contact a parent were refused and when Galason raised his voice to him and said, "I don't give a shit if you go to jail or not."

Considering the totality of the circumstances, we conclude that the State did not prove by a preponderance of the evidence that defendant's confession was voluntary.

For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

Affirmed.

GROMETER, P.J., and CALLUM, J., concur.