2017 IL App (3d) 130190-B

Opinion filed January 31, 2017

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2017

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-13-0190 Circuit No. 09-CF-1559 |
| | ) | |
| MATTHEW T. EDWARDS, | ) ) | |
| Defendant-Appellant. | ) ) | Honorable Amy Bertani-Tomczak, Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Presiding Justice Holdridge concurred in the judgment and opinion.
Justice Wright concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     Following a stipulated bench trial, the Will County circuit court found defendant, Matthew Edwards, guilty of first degree murder and attempted murder.

¶ 2     Prior to trial, defendant filed a motion to suppress, claiming his confession to police was involuntary based on the fact that he was 17 years old at the time, had a fifth grade reading level, suffered from various mental disorders, and that the investigating officers did not allow him to speak to his mother or another concerned adult despite his request to do so. The trial court denied the motion.

¶ 3 The matter proceeded to a stipulated bench trial, following which the trial court found defendant guilty of both first degree murder and attempted murder. The State dismissed the aggravated battery with a firearm, home invasion, and armed robbery counts.

¶ 4 In the sentencing phase, the State sought enhanced sentences on both charges given that defendant personally discharged a firearm causing both death and great bodily harm. The trial court found that the State proved the enhancement factors and subsequently sentenced defendant to 50 years on the murder conviction and 40 years on the attempted murder conviction.

¶ 5 On March 13, 2013, defendant filed a motion to reduce his sentence, arguing that it was excessive. The court denied the motion.

¶ 6 Defendant appealed, claiming, *inter alia*, that (1) the trial court erred in denying his motion to suppress where defendant was 17 years old at the time of the arrest, had a limited education, and did not have contact with a parent or concerned adult, (2) the trial court erred when it failed to hold the statutorily required fitness hearing after it found a *bona fide* doubt of his fitness to stand trial, (3) the defendant's 90-year sentence is unconstitutional under *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), prohibiting offenders under the age of 18 from receiving mandatory life sentences, and (4) defendant is entitled to an additional day of presentence incarceration credit.

¶ 7 This court affirmed defendant's conviction, directing the trial court to grant defendant one extra day of presentence incarceration credit. *People v. Edwards*, 2015 IL App (3d) 130190. In a supervisory order dated November 23, 2016, our supreme court directed us to vacate and reconsider our judgment in light of *People v. Reyes*, 2016 IL 119271, to determine if a different result is warranted. And so we do. Having done so, we conclude that *Reyes* does not warrant a different result. We affirm as modified.

¶ 8                                    BACKGROUND

¶ 9         The State charged defendant, along with codefendants Ashley Hill, Mary Vetor, and

Jason Orasco by indictment with three counts of first degree murder, one count of attempted

murder, one count of aggravated battery with a firearm, two counts of home invasion, and one

count of armed robbery. The State named Joshua Terdic as the victim in the murder, armed

robbery, and first home invasion charges. The State named Lauren Vasilakis as the victim of the

attempted murder, aggravated battery with a firearm, and second home invasion charges. The

court appointed the public defender to represent defendant.

¶ 10        On September 1, 2009, defendant filed a motion for the appointment of an expert to

determine his fitness to stand trial and whether he was legally sane at the time of the alleged

offenses. Defendant tendered a proposed order to the court indicating that the State had no

objection.

¶ 11        The court ordered Dr. Randi Zoot to examine defendant, determine if he was fit to stand

trial, and if he was legally sane at the time of the offenses. The order stated, "[t]his matter

coming on for hearing on defendant's motion for expert witness and for fitness hearing, and for

other relief, said motion being uncontested by the People of the State of Illinois, and the court

finding that a bona fide doubt exist [*sic*] as to defendant's fitness to stand trial *** it is hereby

ordered" that Dr. Zoot examine defendant.

¶ 12        Ultimately, Dr. Zoot filed a report finding defendant fit to stand trial and sane at the time

of the alleged offenses.

¶ 13        On November 29, 2010, defendant filed a motion to suppress his statements/confession to

the police. The following testimony was elicited at the hearing on the motion.

¶ 14    Detectives Jamie Marquez and Chris Georgeff, both of the Will County and Grundy County major crimes task force, testified that on July 7, 2009, they were dispatched to 512 Cayuga Street in Joliet to assist the Channahon police. Approximately 12 armed officers were there to execute an arrest warrant for Jason Orasco. Sergeant Talmontes directed Marquez and Georgeff to take defendant to the Channahon police department.

¶ 15    Marquez testified that prior to being taken to the police station, defendant voluntarily submitted to a gunshot residue (GSR) test. Georgeff could not recall if defendant submitted to a GSR test. Defendant voluntarily accompanied the officers to the station. The officers, both of whom were armed at the time, did not handcuff defendant. Defendant rode in the front seat of the squad car on the way to the station.

¶ 16    Defendant's interview began at 5:45 p.m. Marquez read defendant the *Miranda* warnings line-by-line. Defendant indicated he understood his rights, initialed each line, and signed the form. Both officers were aware that defendant had just turned 17 years old.

¶ 17    At first, the detectives were only trying to gather facts on defendant's whereabouts on July 7, 2009. They knew that Joshua Terdic had been shot in the head and was in critical condition at the time of the interview. Defendant initially told officers he was not in Channahon on July 7.

¶ 18    The officers left the room to speak with the detectives who were interviewing Hill, Vetor and Orasco. Afterward, Marquez and Georgeff confronted defendant with the codefendants' statements indicating that defendant was, in fact, in Channahon on the day of the incident.

¶ 19    Defendant's initial statements were not recorded as officers were unsure at that time whether he was a suspect. Georgeff stated that he and Marquez did not record the entire interview because they did not believe they were required to do so. Once defendant agreed to

4

give a recorded statement, the last 30 minutes of the interview (which included defendant's confession) were recorded.

¶ 20　　According to Marquez, defendant did not request to speak to his mother. Georgeff could not recall if defendant asked to speak with his mother or if the police offered to allow defendant to call his mother. Marquez and Georgeff were trained as juvenile officers. Georgeff testified that he was "absolutely" acting in defendant's best interests. On recross-examination, defense counsel inquired if Georgeff was only doing what was minimally required to be in defendant's best interests, to which Georgeff responded, "Sure."

¶ 21　　Throughout the course of defendant's detainment and interrogation, he was not beaten or slapped, he was allowed to use the restroom, and he was allowed food and water if he so desired. Officers did not inquire as to whether or not defendant had trouble reading or suffered from any mental illness. Defendant did not volunteer this information, nor did he appear to be under the influence of drugs or alcohol. Marquez testified they never informed defendant that his GSR test came back positive, though Georgeff could not recall.

¶ 22　　The interrogation took place in a conference room, not an interview room. The door was not locked. Despite that, defendant would probably not have been able to leave the building. The interrogation concluded at 8:16 p.m.

¶ 23　　Once officers indicated to defendant that his friends placed him at the scene of the crime, he subsequently gave a statement, which he agreed to have recorded. The tape began at 7:50 p.m. and ended at 8:16 p.m.

¶ 24　　The State offered the digital versatile disc (DVD) of defendant's confession into evidence, and the trial judge watched it in her chambers. In the DVD, defendant acknowledged

5

receiving his *Miranda* rights and answered affirmatively that he knew all his rights. Defendant gave the following narrative of the events of the previous night/early morning of July 7.

¶ 25　　He was drinking with friends at Mary Vetor's house, went to sleep, and was awakened by Jason. Jason knew a place where they could get money and drugs. Defendant said, "Okay, let's go." Ashley and Mary drove the two men; Mary got a ticket while parked outside. Jason grabbed a shovel, which defendant used to break into the apartment. Defendant then unlocked the bedroom door with a knife he had taken from the kitchen.

¶ 26　　The sleeping couple woke up while defendant and Jason searched for money and drugs. Jason said to tie them up, so defendant and Jason did so. Jason hit the male victim in the knee with a baseball bat, breaking the bat. Jason had brought the bat and the gun. The victims were screaming, and Jason told defendant to shoot, to "Just do it." Jason ordered the male victim to put his head under the pillow. Defendant just wanted to scare the male victim and, as Jason was yelling at defendant to shoot and kill him, defendant shot at the pillow. He then lifted the pillow off the male victim, saw blood on the pillow, put it over the female victim's head, and fired two shots. Defendant then left through the window.

¶ 27　　Jason wore a mask, hoodie, and rubber gloves; defendant wore baseball gloves. Defendant gave Jason the gun, which they threw away as they walked to a cabin. Jason and defendant texted Ashley and Mary to come pick them up. The four then returned home to Mary's house.

¶ 28　　In response to questions during the interrogation, defendant stated he was sorry Joshua Terdic got hurt, and he knew he would "have to do something for it" but hoped it would be a low charge. Defendant offered to help find evidence. At the conclusion of the video he stated, "I told mom I'd see her for her birthday and I don't like lying," but acknowledged he had lied initially

6

to cover his tracks. He did not want to get anyone else in trouble. Finally, he acknowledged that he went to the police station voluntarily, had not been handcuffed, that no promises had been made, that he had been given his *Miranda* rights, and had been offered drinks and the use of the bathroom. When officers asked if defendant was hungry, he responded that he was a little bit hungry, and the officers stated they would get him some food. The DVD concluded at 8:16 p.m.

¶ 29    The hearing resumed the next day. Defendant testified that on July 7, 2009, he was 17 years old and was living at Mary Vetor's house. He, along with Jason Orasco, Ashley Hill, Mary and Mary's mother were at the house when police came with an arrest warrant for Jason. The police requested that all household members come outside; defendant complied. Officers directed defendant to stand by one of the squad cars and told him they were going to do a quick GSR test. Afterward, officers asked defendant if he would accompany them down to the station to answer some questions about the shooting. Defendant agreed and went voluntarily. He sat in the front seat of an unmarked squad car and was not handcuffed. Defendant felt he could not decline the officers' invitation.

¶ 30    Upon arriving at the station, officers placed defendant in a conference room. Defendant had been living at Mary's house for a couple months; he did not live with his mother. Defendant testified that as soon as he got to the station he asked to speak with his mother, telling officers it was her birthday "to get their attention." He did not know how else to convince them to allow him to speak to her. The officers did not allow defendant to call his mother, saying "after the interview." Defendant was not physically touched.

¶ 31    Defendant originally denied being in Channahon. The officers left the room and returned two or three minutes later. Midway through the second interview, officers informed defendant the GSR test came back positive and that his friends implicated him in the incident. Defendant's

7

photos were taken for a lineup. Shortly thereafter, defendant gave a statement and agreed to go on video to record the confession.

¶ 32    When asked about specifics of the interrogation on direct, defendant testified that Marquez told him that he did not like it when Georgeff gets angry because he has difficulty calming him down. Georgeff leaned over defendant and spoke in a loud voice. Sometimes the interview was confrontational, sometimes it was not. Prior to the shooting, defendant had never been confronted by the police, been in a police station, or incarcerated. He had two previous run-ins with the police, but his mother was present and he was never arrested. The police told him that he was going to serve some time in prison, but the officers did not say how much. Defendant was afraid of the detectives.

¶ 33    Defendant attended the second half of his freshman year of high school, receiving mostly Ds and Fs. His sophomore year he got Ds and Fs the first semester but did better his second semester because his grandfather made a concerted effort to help him. Defendant took special education classes. He dropped out toward the end of his sophomore year because he felt he did not need school. He read at a fifth or sixth grade level. He suffered from attention deficit disorder (ADD) and attention deficit hyperactivity disorder (ADHD), hindering his ability to learn.

¶ 34    Defendant had also been hospitalized previously and was subsequently diagnosed with a mood disorder, bipolar disorder, and depression. Defendant had been prescribed medication—Depakote—for the disorders. When he was on the medication, he felt that he could understand better and felt more in control. On July 7, he was not taking Depakote. Defendant stopped taking the medication in March or April 2008 because he could no longer afford it. He testified that being unmedicated affected his ability to understand the interview.

¶ 35　　　Defendant knew the meaning of the words "you have the right to remain silent." He did not know what the word "attorney" meant. Defendant had heard of the word "lawyer" but was not familiar with the word "attorney."

¶ 36　　　After dropping out of high school, defendant enrolled in the Lincoln's Challenge Academy in order to help control his disorders. The first two weeks of the program consisted of vigorous physical exercise programs. He did not, however, pass his reading, writing or mathematics courses because he had a hard time paying attention and could not understand. Defendant ultimately graduated from the program; one could graduate by not causing trouble.

¶ 37　　　Janice Edwards, defendant's mother, testified that she was living with her parents on July 7, 2009, and that defendant was not living with her. The police did not contact her when they took defendant into custody. She learned of the incident on July 8, when her brother told her to look at the newspaper, and she saw an article stating that defendant had been arrested in connection with a shooting.

¶ 38　　　Edwards stated that defendant could not read or write very well, and he could not spell. He understood children's books. Defendant would not understand the word "attorney," but he would probably understand the word "lawyer." Defendant suffered from mental health problems throughout his life. He had been in trouble with the police a couple of years before the shooting. Though prescribed medication for his disorders, she could not afford them and public aid would not cover the medications because she made too much money.

¶ 39　　　Defendant got into the Lincoln's Challenge Academy with the help of his high school counselor. Defendant did well in the program, as it provided the structure he needed. He did not do well in the academic portion of the program, and he failed the GED test miserably. Defendant did not attend his high school classes because he did not know what was going on.

¶ 40     After the Lincoln program, defendant lived with his older brother. He was not welcome at his grandparents' home because he had been stealing. According to his mother, at 16 years old, defendant made his own arrangements.

¶ 41     At the conclusion of argument, the court denied defendant's motion to suppress. The court specifically found that at 17 years old, defendant was not at a tender age. In viewing the DVD, the court found defendant articulate, he used appropriate words, and his responses showed an ability to understand the questions posed to him. While defendant lied about it being his mother's birthday, apparently in order to see her, the court did not find that dispositive. Defendant had stopped taking medications for his various disorders over a year before the interrogation. His records from Joliet High School showed that defendant had an above average learning potential. The records further indicated that defendant was not developmentally delayed, nor did he suffer from any type of learning, speech, or hearing impairment. Under the totality of the circumstances and based upon the credibility of the witnesses, the court found that defendant's statement was voluntary.

¶ 42     The State then filed a notice of intent to seek enhanced sentences on the first degree murder and attempted murder charges based on the fact that defendant personally discharged a firearm causing both death and great bodily harm. On December 12, 2014, the cause proceeded by way of a stipulated bench trial. The State dismissed the home invasion, aggravated battery, and armed robbery charges.

¶ 43     Both parties presented a number of stipulations as to evidence, testimony of the witnesses, and transcripts from the trials of Mary Vetor and Jason Orasco.

¶ 44     The evidence tended to show that defendant and Jason Orasco broke into Terdic's home in the early morning hours of July 7 looking for money and drugs. When they found only a small

amount of both, they woke up the sleeping couple and demanded more. Vasilakis recognized Orasco's voice because she had known him for several years through her sister. She picked defendant out of a lineup as the man who was holding the gun most of the time. Terdic and Vasilakis were tied up, ordered to lie on their stomachs, and a pillow was placed over their heads. Defendant asked if they should use the bat to try to knock out the victims. Orasco said "no" and that defendant should just "do it." Vasilakis felt someone on the bed over Terdic, who was lying next to her, and then she heard a shot. The person got up, went around the bed, and got on top of her. She heard two clicks and a bang, and then she realized she had been shot. After defendant and Orasco left, Vasilakis untied herself and had the neighbor call the police.

¶ 45    The trial court found defendant guilty and that the State had proved the enhancement factors.

¶ 46    On February 27, 2013, the court sentenced defendant to 50 years on the murder conviction and 40 years on the attempted murder conviction. The sentences were to run consecutively to one another. The court further awarded defendant custody credit from July 8, 2009, to February 27, 2013.

¶ 47    Defendant subsequently filed a motion to reduce his sentence, arguing that it was excessive. The court denied the motion.

¶ 48    Defendant appeals.

¶ 49                                   ANALYSIS

¶ 50                    I. Denial of Defendant's Motion to Suppress

¶ 51    Defendant first contends that the trial court erred in denying his motion to suppress. Specifically, that his statement cannot be considered voluntary where he was 17 years old at the

11

time, had a limited education, read only at a fifth or sixth grade level, did not have contact with a parent or other concerned adult, and had minimal prior contacts with the police.

¶ 52    When faced with a challenge to a circuit court's ruling on the voluntariness of a confession, a reviewing court will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence. However, the ultimate ruling on whether a confession was voluntary is reviewed under the *de novo* standard. *People v. Murdock*, 2012 IL 112362, ¶ 29.

¶ 53    Illinois courts have long recognized that receiving a confession from a juvenile is a "sensitive concern." *People v. Prude*, 66 Ill. 2d 470, 476 (1977); *Murdock*, 2012 IL 112362, ¶ 32. As a consequence, " 'the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' " *People v. Simmons*, 60 Ill. 2d 173, 180 (1975) (quoting *In re Gault*, 387 U.S. 1, 55 (1967)). Due to these concerns, an additional factor is recognized that is not present in cases involving confessions by adults. This factor, commonly known as the "concerned adult" factor, considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare. *In re G.O.*, 191 Ill. 2d 37, 54-55 (2000).

¶ 54    Thus, in determining whether a juvenile's confession was voluntarily given, relevant considerations include (1) the juvenile's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning; (2) the duration of the detention, including whether the police physically or mentally abused the juvenile or employed trickery or deceit in obtaining the confession; and (3) whether the juvenile had an opportunity to speak with a parent or other concerned adult prior to or during the interrogation, including

12

whether the police prevented or frustrated such opportunities. *Murdock*, 2012 IL 112362, ¶¶ 30-32. No single factor is dispositive; rather, the courts must consider the totality of the circumstances surrounding the confession. *Id.* ¶ 30.

¶ 55 While we acknowledge that defendant suffered from some mental health disorders and did not finish high school, based upon our review of the record, the trial court's factual findings and prevailing case law on the subject, we cannot find that the trial court erred in denying defendant's motion to suppress.

¶ 56 Defendant places a great amount of emphasis on the fact that he did not have contact with a concerned adult during the interrogation. He argues that the concerned adult factor weighs heavily in his case, where the Juvenile Court Act of 1987 (the Act) provides:

> "A law enforcement officer who arrests a minor without a warrant under Section 5-401 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for these purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/5-405(2) (West 2008).

¶ 57 We note, however, that defendant was not subject to the provisions of the Act at the time of the shooting and subsequent interrogation, where section 5-120 provided that the relevant

provisions of the Act applied to minors who violated or attempted to violate the law prior to their seventeenth birthday. 705 ILCS 405/5-120 (West 2008). Defendant was 17 years old at the time of the incident in July 2009. Pursuant to Public Act 98-61 (eff. Jan. 1, 2014), the legislature amended section 5-120 to apply to 17-year-olds. Pub. Act 98-61, § 5 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-120). This change occurred 4½ years after defendant's interrogation.

¶ 58 Defendant concedes he falls outside the purview of the Act but, notwithstanding that, argues that the concerned adult factor still applies to him on common law grounds, citing *People v. Westmorland*, 372 Ill. App. 3d 868, 880 (2007). *Westmorland*, however, is readily distinguishable from the case at bar. In *Westmorland*, the 17-year-old defendant charged with multiple sex offenses moved to suppress his statements to police as involuntary. The trial court granted the motion, noting that despite the fact that defendant was 17 years old, " '[h]e appears not to be a very mature 17.' " *Id.* at 874. Defendant struck the court as being somewhat immature, a little bit pudgy with rosy cheeks. *Id.* The court further observed defendant as under six feet tall, wide-eyed, frightened, with no noticeable facial hair. *Id.*

¶ 59 By comparison, the interviewing officer was an imposing figure, well over six feet tall, over 200 pounds, fit and muscular, and with a dominant personality. *Id.* The court also found that the defendant was handcuffed and abandoned in the interrogation room, the officer used threatening language, and that the officers engaged in some deception during the interview when they led defendant to believe that if he cooperated he could go home. Police refused defendant's two requests to contact his mother and made no effort themselves to contact defendant's parents before or during the interview. *Id.* at 890. The appellate court affirmed, noting that the Act did not restrict the factors to be considered under the common law/constitutional voluntariness inquiry. *Id.* at 880. Applying the concerned adult factor, the court found that under the totality of

14

the circumstances, the State did not prove by a preponderance of the evidence that defendant's confession was voluntary. *Id.*

¶ 60    We are confronted with a very different scenario here. The trial court reviewed the interview tape twice and observed defendant during his testimony on the motion to suppress. The trial court thoroughly and methodically considered the factors of defendant's age, intelligence, background, experience, mental capacity, education and physical condition at the time of questioning. Defendant was no wide-eyed, 17-year-old that appeared immature. Quite the opposite, defendant responded appropriately to questioning and was articulate, both during the interview and in his testimony during the suppression hearing. While there was some allusion to force and deception on the part of officers in *Westmorland*, there was no such behavior exhibited by officers here. Both Marquez and Georgeff were trained juvenile officers, and Georgeff testified that they acted in defendant's best interests. That Marquez and Georgeff only recorded the confession portion of defendant's interview does not render the statement involuntary. The trial court clearly found the officers' testimony credible that they initially only brought defendant in to establish his whereabouts and ask a few questions.

¶ 61    Finally, the officers were not bound by the dictates of the Act to contact defendant's mother or to allow him to speak with a concerned adult. Even when considering the concerned adult factor as one of many when determining the voluntariness of a confession, our supreme court has specifically held that a juvenile confession should not be suppressed simply because he was denied the opportunity to confer with a concerned adult. *In re G.O.*, 191 Ill. 2d at 55. Here, there were conflicting accounts from defendant and the officers regarding whether or not he requested to speak with his mother. The trial court found that the fact defendant did not speak with his mother or another concerned adult was not dispositive. Based on the totality of the

15

circumstances presented, we agree. The trial court's factual findings are not against the manifest weight of the evidence. Accordingly, we find that defendant's statements were voluntary and the trial court did not err in denying his motion to suppress.

¶ 62                    II. *Bona Fide* Doubt of Defendant's Fitness to Stand Trial

¶ 63         Defendant contends that after the trial court signed an order finding a *bona fide* doubt of defendant's fitness and ordering a psychological evaluation, the trial court erred when it failed to hold the statutorily required fitness hearing before proceeding to the stipulated bench trial. Despite his failure to object at trial or addressing it in his posttrial motion, defendant contends we should review this issue under the second prong of the plain-error doctrine. Without addressing defendant's alleged forfeiture of the issue or mentioning plain-error review, the State argues that the trial court did not actually raise or find a *bona fide* doubt of defendant's fitness but merely granted defendant's motion for a fitness examination.

¶ 64         First, the plain-error doctrine allows a reviewing court to consider unpreserved error when one of two conditions is met:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Walker*, 232 Ill. 2d 113, 124 (2009) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

16

¶ 65    "Under both prongs of the plain-error doctrine, the burden of persuasion remains with defendant." *Id.* (citing *People v. Naylor*, 229 Ill. 2d 584, 593 (2008)). The initial step in conducting plain-error analysis is to determine whether error occurred at all. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008). We are therefore obligated to conduct a substantive review of the issue. See *People v. Johnson*, 208 Ill. 2d 53, 64 (2003).

¶ 66    Here, defendant's claim implicates section 104-11 of the Code of Criminal Procedure of 1963 (the Code), which provides, in relevant part, as follows:

> "(a) The issue of the defendant's fitness for trial, *** may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial. When a bona fide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further.
>
> (b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bona fide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination. However, no order entered pursuant to this subsection shall prevent further proceedings in the case. An expert so appointed shall examine the defendant and make a report as provided in Section 104-15. Upon the filing with the court of a verified statement of services rendered, the court shall enter an order on the county board to pay such expert a reasonable fee stated in the order." 725 ILCS 5/104-11 (West 2012).

17

¶ 67    Also at issue is section 104-13, under which defendant originally brought his motion for fitness hearing and for appointment of an expert witness to determine defendant's sanity. That section provides, in pertinent part, as follows:

> "(a) When the issue of fitness involves the defendant's mental condition, the court shall order an examination of the defendant by one or more licensed physicians, clinical psychologists, or psychiatrists chosen by the court." 725 ILCS 5/104-13 (West 2012).

¶ 68    The parties dispute whether or not the trial court expressly made a finding that a *bona fide* doubt of fitness existed. This is based in large part on the fact that the signed order, drafted by defense counsel, states: "This matter coming on for hearing on defendant's motion for expert witness and for fitness hearing, and for other relief, said motion being uncontested by the People of the State of Illinois, and the Court finding that a bonafide doubt exist [*sic*] as to Defendant's fitness to stand trial under 725 ILCS 5/104-13 *et seq.*"

¶ 69    We agree with the State and find *People v. Hanson*, 212 Ill. 2d 212 (2004), directly on point. In *Hanson*, our supreme court determined that a grant of a defense motion for a psychological evaluation, without more, does not create a sufficient inference that the trial court found *bona fide* doubt of defendant's fitness to stand trial such that the trial court would be required to hold a fitness hearing before proceeding.

¶ 70    Specifically, the court noted that the defense motion referred only to section 104-13(a) of the Code (725 ILCS 5/104-13(a) (West 2012)) and made no reference to section 104-11(a) or (b). *Hanson*, 212 Ill. 2d at 218. Section 104-13(a) only specifies who may be appointed to examine a defendant when the question of fitness involves mental health issues and can be used in

18

conjunction with section 104-11(a) or (b). *Id.* at 219. Thus, the language in defendant's own motion failed to advance his argument that the trial court was bound to hold a fitness hearing under section 104-11(a). *Id.* at 219-20.

¶ 71        Similarly, defendant here brought his motion pursuant to section 104-13(a), requesting that the court appoint a qualified expert to evaluate defendant's fitness to stand trial, not under 104-11(a). Although the order the court signed contained the language "*bona fide* doubt," it was defendant who drafted this order. A review of the record gives us no indication whatsoever that the trial court or the State implicitly agreed with defense counsel, or raised on their own a *bona fide* doubt of defendant's fitness. We note that under *Hanson*, even if defendant filed a motion under section 104-11(a), the trial court could specify its need for a fitness examination by an expert to aid in its determination of whether a *bona fide* doubt is raised without a fitness hearing becoming mandatory. *Id.* at 217. Considering that contemporaneously with the substance of defendant's motion, we find that defendant merely requested an expert evaluation.

¶ 72        Finally, this situation is a far cry from that of *People v. Smith*, 353 Ill. App. 3d 236 (2004), where the court raised *sua sponte* a *bona fide* doubt of defendant's fitness to stand trial after defendant's first psychological evaluation and defendant's expression of dissatisfaction with the public defender and repeated requests to represent himself. *Id.* at 238. The trial court further articulated her concern regarding defendant's potential for " 'outbursts.' " *Id.* at 241. By contrast, although the order drafted here was inartful, we find the court's oral comments and actions reflect that the issue of fitness had been raised, and it ordered a fitness evaluation to assist in determining whether a *bona fide* doubt as to fitness actually existed. This determination is bolstered by the fact that nothing in the record supported a conclusion that defendant was unfit.

¶ 73        We accordingly find no error, plain or otherwise, in the trial court's decision to proceed to trial without holding a fitness hearing.

¶ 74        III. Sentencing

¶ 75        Defendant also contends that his 90-year sentence amounts to a *de facto* life sentence in violation of *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), which prohibits the imposition of a mandatory life sentence on offenders under the age of 18. Despite failing to raise this issue during sentencing or in his later motion to reduce sentence, defendant argues the court can review a challenge to the constitutionality of a sentencing scheme at any time. *People v. Ruiz*, 342 Ill. App. 3d 750, 762 (2003).

¶ 76        The State counters that those cases cited by defendant, *Miller v. Alabama*, *Graham v. Florida*, 560 U.S. 48 (2010), *Roper v. Simmons*, 543 U.S. 551 (2005), and *People v. Miller*, 202 Ill. 2d 328 (2008), are all distinguishable, insofar as they all dealt with the imposition on minor defendants of either a mandatory natural life sentence without the possibility of parole or a death sentence. The State argues that this court should not expand that line of cases to include mandatory sentencing schemes that do not impose either the death penalty or life without parole. We agree.

¶ 77        Defendant faced a mandatory minimum term of 45 years for first degree murder (a 20-year minimum term plus 25-years-to-life firearm enhancement). See 730 ILCS 5/5-4.5-20(a) (West 2008); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008). For attempted murder, defendant faced a mandatory minimum term of 31 years (a 6-year minimum term plus 25-years-to-life firearm enhancement). See 730 ILCS 5/5-4.5-25 (West 2008); 720 ILCS 5/8-4(a) (West 2008); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008). These terms must be served consecutively (730 ILCS 5/5-8-

20

4(a)(i) (West 2008)). Defendant was therefore subject to a mandatory minimum term of 76 years' imprisonment.

¶ 78    The thrust of defendant's argument on appeal is that this 76-year minimum is unconstitutional. However, the trial court did not sentence defendant to the minimum; it sentenced him to 90 years' imprisonment, or 14 years over the mandatory minimum. The 50-year sentence on the murder charge exceeded the statutory minimum by 5 years. The 40-year sentence on the attempted murder exceeded the statutory minimum by 9 years.

¶ 79    Defendant cites to no case law, nor has our research uncovered any, that allows a defendant to argue that a sentence he did not actually receive is unconstitutional. Defendant does not argue that the 90-year sentence is unconstitutional, nor does he contend that the sentence is excessive or that the trial court abused its discretion in imposing it. Had the trial court sentenced defendant to the mandatory minimum of 76 years, we would have a different case. We point out that virtually every sentence has a mandatory minimum. It makes no difference to our analysis here if the mandatory minimum sentence was 30 years or 76 years, where defendant was not sentenced to the minimum. There is no indication that even had the minimum sentence been a hypothetical 30 years, the trial judge in this case would not have sentenced defendant to 90 years for what amounted to the execution of one individual and the attempted execution of another.

¶ 80    Notably, *Miller v. Alabama* did not hold that a juvenile could never be sentenced to life. Rather, it held that a statutory scheme which makes the imposition of life without parole mandatory for the sentencing court, *i.e.*, the court has no discretion to consider the mitigating factor of the offender's juvenile status, is prohibited by the eighth amendment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. *Miller* is distinguishable in at least two critical ways. First, the Arkansas and Alabama statutes at issue in that case differ markedly from the sentencing

21

provisions at play in this case, insofar as the trial court's discretion is limited to choosing between death or life imprisonment without parole. See Ark. Code Ann. § 5-4-104(b) (1997) ("A defendant convicted of capital murder [citation] or treason [citation] shall be sentenced to death or life imprisonment without parole ***."); see also Ala. Code §§ 13A-5-40(9), 13A-6-2(c) (1982) (providing that murder is a Class A felony, the punishment for which is death or life imprisonment without parole). Second, here, the trial court sentenced defendant to a term above the mandatory minimum. That is, in *Miller*, defendants complained of the sentences handed them.

¶ 81        Our supreme court issued a supervisory order to reconsider our holding in light of *People v. Reyes*, 2016 IL 119271, which held that a minor could not, under *Miller*, receive a statutorily-mandated *de facto* life sentence. The *Reyes* holding neither affects the rationale of our opinion in this case nor requires a different result. The critical distinction between *Reyes* and the instant case is that defendant Reyes was sentenced to the statute-mandated minimum of 97 years for his crimes and, therefore, had standing to challenge the constitutionality of his sentence under *Miller*.[1] Defendant, on the other hand, is challenging a sentence he never received and a constitutional doctrine that does not apply to his case.

¶ 82        In this appeal, defendant argues only that the mandatory minimum sentences are unconstitutional. We reject defendant's attempts to attack the constitutionality of sentences he did not receive. Defendant received discretionary sentences.

¶ 83                                IV. Presentence Incarceration Credit

_____

[1]See *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("Embedded in the traditional rules governing constitutional adjudication is the principal that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.")

22

¶ 84         Defendant argues, and the State concedes, that he is entitled to one additional day of pre-sentence incarceration credit. Defendant was taken into custody on July 7, 2009, but the trial court's judgment ordered that defendant be given presentence incarceration credit from July 8, 2009. Pursuant to *People v. Smith*, 258 Ill. App. 3d 261, 267 (1994), a defendant held in custody for even part of a day, including the day he was arrested, must be given sentence credit for that day.

¶ 85         Accordingly, we direct the trial court to grant defendant one extra day of presentence incarceration credit.

¶ 86                           CONCLUSION

¶ 87         For the foregoing reasons, the judgment of the circuit court of Will County is affirmed as modified.

¶ 88         Affirmed as modified.

¶ 89         JUSTICE WRIGHT, concurring in part and dissenting in part.

¶ 90         I agree on all issues except the issue regarding whether a *bona fide* doubt existed concerning defendant's fitness to stand trial. Like the author, I am troubled that the State has not addressed defendant's admission of forfeiture and defendant's request for this court to excuse forfeiture based on the second prong of plain error. Instead, the State argues the court order, which included a finding that a *bona fide* doubt concerning this young offender's fitness existed, should be ignored by this court. According to the State, the trial court did not intend to find a *bona fide* doubt of defendant's fitness to stand trial, despite the language contained in its order.

¶ 91         I am reluctant to ignore the trial court's explicit finding, as clearly and unequivocally stated in the written order dated September 4, 2009. I must assume that even though the defense drafted the order signed by the judge, both the prosecutor and the court had an opportunity to

23

*read* and either approve or reject the language contained in the proposed order. Absent some allegation of fraud on the part of defense counsel, I presume the trial court intended to include that finding in its written court order. Moreover, the prosecutor had a chance to strike this language from the written order and failed to do so, thereby acquiescing in the order's contents.

¶ 92     I respectfully suggest the court should have taken great care to resolve the fitness issue after ordering a fitness examination. In fact, the court's oversight, under these circumstances, could have had drastic consequences impacting the viability of defendant's convictions in the event of an appeal. An unresolved issue regarding defendant's fitness typically requires this court to vacate defendant's conviction and sentence and grant a new trial. See *People v. Hill*, 297 Ill. App. 3d 500, 514 (1998). Hence, once this trial judge ordered a fitness examination, it was incumbent on the trial court to ensure a fitness hearing occurred.

¶ 93     I note it has been more than one year since defendant's December 10, 2012, trial and the subsequent sentencing hearing. Under these circumstances, our supreme court has cautioned that a retrospective fitness hearing would normally be inadequate to protect defendant's rights when more than one year has passed since defendant's original trial and sentencing. *People v. Neal*, 179 Ill. 2d 541, 554 (1997). However, as recognized by *Neal*, in certain cases the issue of defendant's fitness or lack of fitness at the time of trial may be fairly and accurately determined long after the fact. *Id.* I submit, this is such a case, since defendant does not contend on appeal that he was actually unfit to stand trial. Therefore, unlike the majority, I conclude a retrospective fitness hearing is required based on the second prong of plain error, which the State has not addressed or contested on appeal.

¶ 94     Consequently, I respectfully disagree with the author's conclusion that the written order contained an unintended factual finding by the court, such that the trial court did not find a *bona*

24

*fide* doubt of defendant's fitness existed. For these reasons, I suggest the trial court erred when it failed to conduct a fitness hearing prior to defendant's trial and this structural error cannot be subject to forfeiture. In conclusion, I observe the proper remedy in this case is a retrospective fitness hearing and, if the trial court determines defendant was unfit to stand trial after the retrospective hearing, I would direct the trial court to vacate defendant's convictions and set the matter for a new trial.