**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 190598-U

Order filed March 28, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0598 Circuit No. 18-CF-488 |
| | ) | |
| DEMETRIOUS MONTELL HOUSTON, | ) ) | Honorable Daniel L. Kennedy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The court did not err in making its fitness determination. The court's failure to provide the correct Illinois Supreme Court Rule 431(b) admonishment to the potential jurors is not a reversible plain error.

¶ 2    Defendant, Demetrious Montell Houston, appeals his convictions for residential burglary, indecent solicitation of a child, and sexual exploitation of a child. Defendant argues the Will County circuit court failed to: (1) make an independent determination of his fitness to stand trial

at the fitness hearing, and (2) comply with the requirements of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 3                                   I. BACKGROUND

¶ 4        The State charged defendant with four counts of residential burglary (720 ILCS 5/19-3(a), (b) (West 2018)), two counts of indecent solicitation of a child (*id.* § 11-6), and one count of sexual exploitation of a child (*id.* § 11-9.1(a)(2)). Counsel was appointed to represent defendant.

¶ 5        On October 24, 2018, defense counsel opined as to defendant's fitness to stand trial, stating:

> "Your Honor, at this time I'm requesting a fitness evaluation. Based on my conversation with the defendant, I believe there's a *bona fide* doubt whether he's fit or not. I'm asking [for] the evaluation, I'm asking [Y]our Honor to sign the order, have the next court date be November 26th for return of the evaluation. Also asking [Y]our Honor to sign the order so I can provide these documents to the Chief Judge's Office."

The State offered no opinion regarding defendant's fitness, and the court granted defense counsel's motion, stating: "[o]kay, so ordered, um, to be evaluated." The court then signed a preprinted form order, which read: "Pursuant to 725 ILCS 5/104-11, the Court finds that a *bona fide* doubt exists as to the [defendant]'s fitness to stand trial." The case was continued to November 26, 2018, and then again to December 17, 2018, for completion of the fitness evaluation.

¶ 6        The evaluation opined that defendant was fit to stand trial. On December 17, 2018, the court held a fitness hearing which proceeded as follows:

2

"[DEFENSE COUNSEL]: Judge, it is up for fitness hearing.

THE COURT: Do we have a report?

[DEFENSE COUNSEL]: Yes.

THE COURT: Come on up. What was the finding of the report?

[DEFENSE COUNSEL]: He was found fit. We do have a stipulation.

THE COURT: Any openings on behalf of the State?

[THE STATE]: Waive.

THE COURT: Any openings on behalf of the defense?

[DEFENSE COUNSEL]: Waive. We do stipulate to the education, credentials, and findings of the evaluator ***.

THE COURT: All right. Closing on behalf of the State?

[THE STATE]: Waive.

THE COURT: Any closings on behalf of the defense?

[DEFENSE COUNSEL]: Defense waives.

THE COURT: Okay. Defendant is fit to stand trial. ***"

¶ 7        The case proceeded to jury trial on March 25, 2019. During jury selection, the court made the following inquiry to the jurors:

"Do you understand this means A) the State has the burden of proving the defendant guilty beyond a reasonable doubt? Let the record reflect no one has raised their hand.

B) the defendant does not have to prove his innocence? Let the record reflect no one has raised their hand.

3

C) the defendant does not have to present any evidence on his own behalf?

Let the record reflect no one has raised their hand.

Do you have any disagreements with any of these principles of law? Let the record reflect no one has raised their hand."

¶ 8     At trial, April F. testified that she had two daughters, J.F. and S.F. On March 8, 2018, J.F. was 12 years old and S.F. was 6 years old. The children had been released from school early and were at home with J.F.'s friend, K.D., while April was at work. April indicated that J.F. called her several times and informed her that a man was at the door, and he would not leave. The man entered their apartment. Both J.F. and April, via speaker phone, told the man to leave. April spoke with the man, and he told April that his name was Joey, he was 13 years old, J.F. had called him over, and he had met her in the kitchen. April heard J.F. say that the man "has his private parts out."

¶ 9     April immediately left work to return home. She observed a man exit through the side of her apartment and walk around the front of the building. April had never seen the man before. She followed and observed him enter an apartment a short distance away. She stood outside until police arrived. April identified defendant as the man she saw that day. She testified that a cell phone had been taken from her kitchen during the incident. Photographs of the cell phone were admitted into evidence.

¶ 10    J.F. testified that on March 8, 2018, she was home with S.F. and K.D. A man knocked on the door and asked if her mother was home. April was at work at the time, but J.F. lied and told the man that April was asleep on the couch. He asked J.F. to wake April. J.F. pretended to try several times, eventually telling the man that her mother would not wake up. She attempted to close the door, but the man pushed it open and entered the apartment. She identified defendant as

4

the man who entered her apartment. He walked around the apartment looking for April. Defendant entered April's bedroom and knocked belongings off the dresser and moved blankets around.

¶ 11    The children were in J.F.'s bedroom at the time. J.F. called April and defendant entered J.F.'s bedroom. Defendant would not answer any of J.F.'s questions. J.F. saw that defendant's pants were undone, and his boxer shorts were unfastened. She did not observe this until defendant stepped in front of her and lifted his jacket. She saw defendant's penis while he was holding his jacket up. Defendant told J.F. to "come taste him in the bathroom." J.F. was on the phone with April at that time. She put the call on speaker so April could speak with defendant. He left the bedroom with the phone, speaking to April as he left. Defendant went to the kitchen and began to leave with J.F.'s cell phone. J.F. ran after defendant and retrieved the phone. Defendant left the apartment.

¶ 12    J.F. testified that officers brought defendant to her apartment. J.F. identified defendant as the man who entered her apartment that day. J.F. described the clothing that defendant was wearing as: a dark colored shirt, red boxers, pants with designs on the back pockets, timberland boots, and an oversized jacket. Officers showed her defendant but did not have him lift his shirt or jacket during the on-scene identification. The only time J.F. had seen defendant's boxer shorts was in her bedroom when defendant exposed himself.

¶ 13    K.D. testified that she was a friend of J.F. and had gone home with her on March 8, 2018, after their early release from school. She stayed in J.F.'s bedroom for the entirety of the incident. Someone began knocking on the door and J.F. left the bedroom to answer it. An unknown man entered the apartment. At trial, K.D. identified defendant as the man who entered the apartment. From J.F.'s bedroom, K.D. could see defendant walking into different rooms. He eventually

5

came to J.F.'s bedroom. Defendant stopped at the door and asked K.D. to come out of the room. He told K.D. to "come taste him." K.D. did not move from her position on J.F.'s bed.

¶ 14        J.F. called her mother as defendant entered the bedroom. He moved in front of J.F. with his back to K.D. K.D. heard J.F. say that defendant had his penis exposed and she was scared. K.D. did not see defendant's penis. Defendant began speaking with April and left the bedroom with J.F.'s cell phone. K.D. indicated during a victim interview that she observed defendant move his hands toward his pants and begin rubbing his genitals outside of his pants. When police brought defendant back to April's apartment, K.D. identified defendant to police as the man who had entered the apartment. She recalled seeing defendant once previously, a few weeks before the incident. She and J.F. had been walking to April's apartment and defendant yelled at them and told them to "come here."

¶ 15        Derrick Dawson testified that he was April's neighbor. On March 8, 2018, he observed a black male with a medium build exiting April's apartment. He had never seen the man before. He saw J.F. run after the man and ask for her cell phone back, which the man provided. The man left quickly. Dawson met April when she returned home. They followed the man and Dawson waited with April for officers to arrive.

¶ 16        Officer Peter Van Gessel of the Joliet Police Department testified that he met with April who identified the apartment the man had entered. He knocked on the door of that apartment for 10 minutes with no answer. Eventually, an apartment resident, Elaine Glover, arrived and allowed police to enter and search her apartment. Van Gessel located defendant sleeping in the bedroom. Defendant was fully clothed, lying face down on the mattress. Van Gessel searched the apartment for the missing cell phone that was taken from April's kitchen. A cell phone was discovered hidden in the ceiling tiles of Glover's apartment.

6

¶ 17        Sergeant Tizoc Landeros of the Joliet Police Department testified that in March 2018, he conducted an interview with defendant. The interview was video and audio recorded. The recording was admitted into evidence and published to the jury.

¶ 18        In the interview, defendant informed the officers that he did not know the people who lived in the apartment, but he had seen them previously. He knocked on the door and asked the child who answered if her mother was present. Initially, he indicated that the child let him into the apartment and told him that her mother was asleep on the couch; however, she was not there so he went into her bedroom. The child was on the phone with her mother. He informed the officers that the mother had called him earlier on his brother's phone. He spoke with the mother on her child's phone and inquired if she asked him to come to the apartment. When the mother said she did not, he left the apartment. As he left, a woman he had never seen before followed him to Glover's apartment, accusing him of exposing himself to her daughter. He indicated that his pants had not fallen at April's apartment, and he had not exposed his penis.

¶ 19        As the interview progressed, defendant admitted that he entered the apartment without being invited. He again indicated that April had called his brother's phone; however, when confronted with the information that the phone records would be used to confirm that, defendant admitted he lied about April calling his brother. He explained that he knocked on two different doors before knocking at April's apartment and received no answer. He then explained that an individual named Jimmy had driven him to the apartment because the woman there wanted to have sexual intercourse with defendant. He again denied exposing himself intentionally or inadvertently and denied the desire to have oral intercourse with the children that were present. He reiterated that the mother had invited him to the apartment to have sexual intercourse.

7

¶ 20    After this exchange, defendant explained to police that he had been walking in the area and randomly went to an apartment door. He knocked and received no answer. He then went to a second door which was open. He pushed the door open, and a child came to the door. He asked if her mother was home and then entered the apartment without an invitation. He asked the child to wake her mother and followed her into a bedroom. While in the apartment, he took loose change and a cell phone. He entered another bedroom where two children were present. One child was on the phone with her mother. Defendant grabbed the phone and spoke with the mother. He lied to her about his name and walked toward the kitchen with the phone. The child asked him to return the cell phone, which he did. He left the apartment. He admitted that the cell phone and change he had taken were found at Glover's apartment. He informed officers that he put the cell phone in the ceiling tiles. Defendant denied exposing himself or asking the children for oral sex but admitted to rubbing his genitals over his clothing.

¶ 21    Defendant continued to insist that the mother had called him over to the apartment to have sexual intercourse. He again claimed that she had called his brother and that the child had let him into the apartment. After which, he looked for the mother and upon failing to locate her, grabbed the cell phone and change and left.

¶ 22    Eric Stanley, an evidence technician for the Joliet Police Department, testified that he took photographs of the individual that was apprehended by police on March 8, 2018, regarding this incident. He identified defendant as the individual that was apprehended. He took photographs depicting defendant and the clothing that he was wearing that day which were admitted into evidence. The photographs matched the description provided by J.F.

¶ 23    Officer Gregory Kazak of the Joliet Police Department testified that he responded to April's apartment on March 8, 2018. J.F. and K.D. were separated and he took their statements.

8

J.F. reported that defendant had exposed himself to her and said to her, "[c]ome taste me." K.D. reported that defendant asked her to "come play with [him]". Neither child reported that they had asked defendant to leave the apartment. On cross-examination, Kazak explained that with juvenile victims he would take brief statements initially and then refer them to the Children's Advocacy Center for more in-depth interviews. He acknowledged that as a result, a lack of detail in the account given to him on scene is possible.

¶ 24    The jury found defendant guilty on all seven counts. The court sentenced defendant to an aggregate 10 years' imprisonment. Defendant appeals.

¶ 25    II. ANALYSIS

¶ 26    Defendant argues that the circuit court erred when it (1) passively relied on stipulated findings of defendant's fitness at hearing instead of making an independent determination, and (2) failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) where it failed to ask potential jurors whether they understood and accepted "that if a defendant does not testify it cannot be held against him." Defendant acknowledges that these issues were not preserved for appeal and requests that we review the issues for plain error.

¶ 27    "*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.) *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). A reviewing court may remedy plain errors affecting substantial rights, even if those errors were not objected to during trial or raised in the posttrial motion. See Ill. S. Ct. R. 615(a). The plain error doctrine permits a reviewing court to remedy a "clear or obvious error" when: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the

9

integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant contends that the court's failure to make an independent determination of his fitness at a hearing is reversible under the second prong of the plain error analysis, and its failure to comply with Rule 431(b) is reversible under the first prong of the plain error analysis. The first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 28          A. Failure to Make an Independent Determination at a Fitness Hearing

¶ 29          Defendant contends that the court found a *bona fide* doubt as to his fitness and held a deficient fitness hearing where it passively relied on the parties' stipulation to the findings of the fitness evaluation. The State argues that the court did not err in relying on the stipulated findings of the evaluator where the court did not find a *bona fide* doubt and was, therefore, not required to hold a fitness hearing. To determine whether error occurred, we must first determine whether the court found a *bona fide* doubt as to defendant's fitness.

¶ 30          A criminal defendant is presumed fit to stand trial. 725 ILCS 5/104-10 (West 2018). "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id.* The issue of a defendant's fitness for trial may be raised at any time, by either party or the court. *Id.* A *bona fide* doubt exists when the facts raise a real, substantial, and legitimate doubt regarding a defendant's ability to meaningfully participate in his defense. *People v. Washington*, 2016 IL App (1st) 131198, ¶ 72. Relevant factors that the circuit court may consider in assessing whether a *bona fide* doubt exists include: (1) irrational behavior, (2) defendant's demeanor at trial, (3) prior medical opinions regarding defendant's competence, and (4) defense counsel's representations about defendant's competence. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991).

10

¶ 31   The order for a fitness evaluation was entered pursuant to section 104-11 of the Criminal Code of Procedure of 1963 (Code), which, in relevant part, provides that:

> "(a) The issue of the defendant's fitness for trial, *** may be raised by the defense, the State or the [c]ourt at any appropriate time *** before, during, or after trial. When a *bona fide* doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further.

> (b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a *bona fide* doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination. However, no order entered pursuant to this subsection shall prevent further proceedings in the case." 725 ILCS 5/104-11(a), (b) (West 2018).

"[T]he primary distinction between sections 104-11(a) and 104-11(b) is that section 104-11(a) ensures that a defendant's due process rights are not violated when the trial court has already found *bona fide* doubt to have been raised, while section 104-11(b) aids the trial court in deciding whether there is a *bona fide* doubt of fitness." *People v. Hanson*, 212 Ill. 2d 212, 218 (2004). If the court concludes that no *bona fide* doubt exists, then it need not conduct a fitness hearing. *Id.* at 217.

¶ 32   Whether a *bona fide* doubt exists is an objective and fact-specific inquiry left to the discretion of the court. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 123. An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 33    Here, the record contains a single indication that the court found a *bona fide* doubt as to defendant's fitness to stand trial—the language of the preprinted order that was presented by defense counsel and signed by the court. This court has previously found that signing an order containing this language is not sufficient to establish a *bona fide* doubt where nothing else in the record indicates the court implicitly agreed with defense counsel's opinion of defendant's fitness or raised their own *bona fide* doubt. See *People v. Edwards*, 2021 IL App (3d) 130190-C, ¶ 71. We find defendant's attempts to distinguish *Edwards* unpersuasive.

¶ 34    In both *Edwards*, and the Illinois Supreme Court case which it relied upon, *Hanson*, defense counsel moved for defendant to be evaluated by an expert to determine their fitness to stand trial pursuant to section 104-13 of the Code (725 ILCS 5/104-13 (West 2000); 725 ILCS 5/104-13 (West 2012)). *Edwards*, 2021 IL App (3d) 130190-C, ¶ 71; *Hanson*, 212 Ill. 2d at 219. This section specifies which types of individuals may be appointed to examine a defendant when questions about fitness involve mental health issues. While defense counsel in *Hanson* expressed a *bona fide* doubt as to defendant's fitness in his motion, each case found that bringing a motion under this statute did not advance defendant's argument that a fitness hearing was required under section 104-11(a) of the Code. *Edwards*, 2021 IL App (3d) 130190-C, ¶ 70; *Hanson*, 212 Ill. 2d at 215, 219-20

¶ 35    In the instant case, defense counsel made an oral motion which referenced no statute. He expressed a *bona fide* doubt as to defendant's fitness and requested an evaluation. Defense counsel made no request for a hearing, he merely requested to continue the case for the return of the evaluation. While he did not specifically reference section 104-13, substantively, his motion is the same as the motion in *Hanson*.

12

¶ 36    Defendant also attempts to distinguish *Edwards* by highlighting this court's concern that defense counsel was the person who prepared the order which contained the *bona fide* doubt language. Here, the record is silent as to who drafted the order which the court signed. The record does illustrate that the order that defense counsel presented to the court was a preprinted form order.

¶ 37    The oral pronouncement of the court upon granting defendant's motion contained no explicit finding of a *bona fide* doubt. The court merely acquiesced to defense counsel's request, stating, "[o]kay, so ordered, um, to be evaluated." "When the oral pronouncement of the court and the written order are in conflict, the oral pronouncement of the court controls." *People v. Smith*, 242 Ill. App. 3d 399, 402 (1993). The order signed in this case bears the next court date that was selected for return of the evaluation and the court's signature. All other language was preprinted.

¶ 38    Additionally, the record contains no evidence that would lend itself to an implicit finding of a *bona fide* doubt nor does it contain evidence of defendant's inability to understand the nature and purpose of the proceedings against him. Every time defendant was asked a question or invited to speak, he answered appropriately. There is no indication in the record that any irrational behavior or outbursts occurred. In the absence of any oral indication of finding a *bona fide* doubt, the fact that the court ordered the evaluation or even held a hearing does not lend itself to any implicit finding of such. See *People v. Schnoor*, 2019 IL App (4th) 170571, ¶¶ 40-51 (where the record failed to indicate the court had a *bona fide* doubt as to defendant's fitness, no error occurred by holding a stipulated fitness hearing); *Garcia*, 2012 IL App (1st) 103590, ¶¶ 125-37 (the court's ordering of a fitness hearing did not indicate it shared defense

13

counsel's *bona fide* doubt where the record contained no comment or conduct by the court which supported that contention).

¶ 39    Accordingly, we do not find that this order reflects the intent of the court where the oral pronouncements made by the court contained no such findings and the record contains no support for the finding of a *bona fide* doubt.The record establishes that the court entered the order under section 104-11(b) of the Code, to help determine whether a *bona fide* doubt existed. Having found none, a fitness hearing was not required to proceed to trial.

¶ 40    Finally, the court did not abuse its discretion in failing to find a *bona fide* doubt as to defendant's fitness. As discussed above, defendant exhibited no irrational or disruptive behavior during the proceedings in this case. When defendant appeared in court, he seemed to understand and be aware of the proceedings and charges against him. The fitness evaluation report does reflect prior medical opinions finding defendant unfit and defense counsel's concerns regarding his ability to understand the proceedings; however, it also demonstrates that defendant understood what was occurring, answered the evaluator's questions appropriately, and understood the charges against him. Accordingly, the court did not err in passively accepting the parties' stipulations as to fitness where it did not find a *bona fide* doubt and was not required to hold a fitness hearing.

¶ 41    While we have found no error in the court's passive acceptance of the parties' stipulations, we would suggest that circuit courts explicitly state their findings regarding defendant's fitness on the record. An explicit indication of whether the court has a *bona fide* doubt as to defendant's fitness or is ordering the evaluation to aid in that determination would make a clear record and avoid any unnecessary confusion regarding the court's intent in the future.

¶ 42                              B. Failure to Comply with Rule 431(b)

¶ 43          Next, defendant contends that the court erred where it failed to ask potential jurors whether they understood and accepted "that if a defendant does not testify it cannot be held against him." Defendant argues that this requires a reversal under the first prong of the plain error analysis where the evidence is closely balanced because it presents a credibility contest between defendant and the victims. The State concedes that the court erred in failing to ask jurors about this principle, however, the State argues that evidence was not closely balanced.

¶ 44          To ensure that a defendant receives a fair trial by an impartial jury, the circuit court is required to ask all potential jurors if they understand and accept four specific principles of law. The record before us demonstrates that the court failed to inquire about the fourth principle, that a defendant's decision not to testify cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). "The language of Rule 431(b) is clear and unambiguous. The rule states that the trial court 'shall ask' potential jurors whether they understand and accept the enumerated principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). Rule 431(b) imposes an affirmative duty on the court to make this inquiry to potential jurors. *People v. Birge*, 2021 IL 125644, ¶ 31. Accordingly, courts must take particular care to make these inquiries during the *voir dire* of potential jurors. Based on the record before us, we find the court committed a clear and obvious error when it failed to ask the potential jurors whether they understood and accepted the fourth principle. Having found clear and obvious error, we examine the record to determine whether the evidence was closely balanced.

¶ 45          When arguing for first prong plain error review, defendant bears the burden to persuade the reviewing court that the evidence is closely balanced. *Piatkowski*, 225 Ill. 2d at 567. Whether evidence is closely balanced presents a different question than whether the evidence is sufficient

15

to support the defendant's conviction beyond a reasonable doubt. *Id.* at 566. The question is whether the evidence is so closely balanced that "the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. We employ a commonsense evaluation of the evidence in answering that question and consider the totality of the evidence presented. *Id.* ¶ 53. In evaluating the strength of the evidence, we must consider both "the quantum and quality" of evidence. *Piatkowski*, 225 Ill. 2d at 571.

¶ 46        Defendant argues the evidence regarding the sexual offenses was closely balanced. Concerning the single count of sexual exploitation of a child, defendant contends that the evidence was closely balanced regarding the required element of defendant exposing his sexual organs for the purpose of arousal or gratification of himself or the child. See 720 ILCS 5/11-9.1(a)(2) (West 2018). Concerning the indecent solicitation of a minor charges, defendant contends that the evidence was closely balanced regarding the required element that defendant knowingly solicited J.F. and K.D. to perform a sexual act. See *id.* § 11-6.

¶ 47        Here, there was substantial evidence to support J.F. and K.D.'s account of the sexual exploitation and indecent solicitation charges. Both children testified consistently regarding defendant exposing his penis to J.F. J.F. was able to describe the clothing that defendant was wearing, including his boxer shorts. Photographs of defendant's clothing from the day of the incident were admitted into evidence and consistent with J.F.'s testimony. K.D. did not personally observe defendant's exposed penis, however, she was present in the bedroom at the time it occurred and testified consistently as to J.F.'s contemporaneous reactions and statements. Additionally, April, who was on the phone, heard J.F. state that defendant was exposing himself. Both children's testimony regarding defendant's behavior and solicitous comments reflected the

16

statements they made separately to police on the day of the incident which corroborate one another's account of events.

¶ 48    Defendant's account of the events is mercurial at best. He disclosed to investigators several versions of events throughout the interview. At one point, defendant indicated that April called for him on his brother's phone to come over to her apartment. He claimed J.F. let him into the apartment. Later, defendant admitted that he lied about April calling his brother's phone and that he entered the apartment without being invited. He later indicated that an individual named Jimmy drove him to the apartment then said he had been randomly walking around and decided to knock on apartment doors. Additionally, some of his statements corroborate the testimony of the other witnesses. Defendant admits to entering the apartment and searching for April. He admits to lying about his name to April on the phone and stealing change and a cell phone from the apartment. He admits to grabbing his genitals over his clothing. He denies exposing himself or making solicitous comments to the children. However, defendant's version of events changed so often that it is simply not plausible considering the totality of the evidence. Therefore, we conclude that the evidence was not so closely balanced that the Rule 431(b) error requires reversal under the first prong of the plain error analysis.

¶ 49                                III. CONCLUSION

¶ 50    The judgment of the circuit court of Will County is affirmed.

¶ 51    Affirmed.

17